## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JESSICA DURKIN,<br>　　　　　　Plaintiff<br>　　　v.<br><br>PACCAR, INC., et al.<br>　　　　　　Defendant | Civil Action<br>No. **1:10-cv-02013-JHR-AMD** |

## DEFENDANT WABASH NATIONAL CORPORATION'S MOTION TO EXCLUDE THE TESTIMONY OF BROOKS RUGEMER

## MOTION DATE: August 20, 2012

## ORAL ARGUMENT REQUESTED

WARD GREENBERG HELLER & REIDY LLP

Gerhard P. Dietrich
Paul D. Lux
1835 Market Street, Suite 650
Philadelphia, PA  19103
(215) 836-1100

Attorneys for Defendant,
Wabash National Corporation

Dated:  July 17, 2012

# TABLE OF CONTENTS

Table of Authorities ......................................................................... iv

I. PRELIMINARY STATEMENT .................................................. 1

II. REVELANT FACTS AND EVIDENCE ....................................... 2

III. ARGUMENT ........................................................................ 8

    A. Standards for admissibility of expert testimony ............................ 8

    B. Evidence about DOT-rated bulkheads and DOT-rated front end
       structures is irrelevant, misleading, does not fit the facts of this
       case, and cannot be permitted ................................................... 10

        1. Applicable cargo securement regulations ........................... 11

        2. Bulkhead static load ratings .............................................. 14

        3. There are no ratings for protection from a dynamic impact ............... 15

        4. A different bulkhead would not have changed the outcome ............... 16

    C. Rugemer cannot be permitted to testify about his speculation
       about what Mr. Gangell thought or believed ................................ 17

        1. Rugemer is not qualified to testify about what Gangell
           and Pierson thought or believed (Qualifications) ............................ 18

        2. Rugemer's speculation about what Gangell believed did
           not employ a reliable methodology (Reliability) ............................ 18

        3. Rugemer's speculation about Gangell's beliefs would not
           assist a trier of fact in this case (Fit) ...................................... 19

           a. Speculation can never assist a jury .................................... 19

           b. Contrary to Rugemer's speculation, Gangell would
              not have heeded a warning ...................................... 20

i

c. Rugemer's speculation about whether a warning would have caused the use of a DOT-rated bulkhead is not probative in this case because there is no evidence that the outcome would have been different even if a DOT-rated bulkhead was used ..................... 21

D. Rugemer cannot be permitted to testify about ordinary knowledge common to end-users of flatbed trailers or his beliefs about what a typical flat-bed truck-tractor/trailer driver would think ........................................................................ 21

    1. Rugemer is not qualified to opine about what is known to a typical flat-bed truck-tractor/trailer driver (Qualifications) .......................... 22

       a. Rugemer does not have sufficient experience ........................... 23

       b. Rugemer displayed ignorance of relevant regulations.............. 24

       c. Rugemer's lack of familiarity with unrated bulkheads displays his own lack of qualifications rather than industry-wide unfamiliarity ....................................................... 27

    2. Rugemer did not use reliable methods to determine what a typical user of a flat-bed trailer knew (Reliability)......................... 29

    3. Rugemer's unreliable testimony about what might be known to a typical truck driver would not assist a jury (Fit) .............. 35

E. Rugemer cannot be permitted to imply that a DOT-rated bulkhead would have been sufficient to stop a moving steel load ............... 35

    1. Rugemer is not qualified to give these opinions, nor are the opinions reliable (Qualifications and Reliability)......................... 36

    2. Implying that a different bulkhead could have stopped the load does not fit the facts of the case (Fit).................................... 36

F. Rugemer cannot be permitted to testify about his beliefs about what would be reasonable................................................................... 37

G. Rugemer cannot be permitted to testify or imply that Gangell was permitted to haul 100,000 pounds of cargo on the trailer ...................... 38

H. The probative value of each of his opinions is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ................................................................ 39

IV. CONCLUSION ................................................................................ 40

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Badalamenti v. Simpkiss*, 27 A.3d 191 (N.J. Super. App. Div. 2011) ................ 8

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384 (D.N.J. 2009) ......................................................................................................... 9

*Calderon v. Machinenfabriek Bollegraaf Appingedam BV*, 667 A.2d 1111 (N.J. Super. App. Div. 1995)......................................................................................20

*Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316 (3d Cir. 2003).............22

*Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.*, No. CIV.A. 01-669-KAJ, 2004 WL 1534786 (D. Del. May 21, 2004) ................................20, 37

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)..1, 8, 9, 18, 19, 39

*Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000) .........................................10

*Floorgraphics, Inc. v. News Am. Mktg. In-Store Services, Inc.*, 546 F. Supp. 2d 155 (D.N.J. 2008) ...............................................................................19, 30, 33

*Holman Enterprises v. Fid. & Guar. Ins. Co.*, 563 F. Supp. 2d 467 (D.N.J. 2008) ....................................................................................................................19

*In re Diet Drugs*, No. MDL 1203, 2001 WL 454586 (E.D. Pa. Feb. 1, 2001)....22

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liab. Litig.*, No. MDL 1203, 2000 WL 876900 (E.D. Pa. June 20, 2000) .............18, 19

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ...................10, 39

*Kerrigan v. Maxon Ind.*, 223 F. Supp. 2d 626 (E.D. Pa. 2002) .........................22

*Larson v. United Natural Foods W., Inc.*, No. CV-10-185-PHX-DGC, 2011 WL 3267316 (D. Ariz. July 29, 2011) ...................................................................... 8

*Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000)............................9, 10, 19

*Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431(D. Del. 2004)....18, 19

*Pittsburgh Press Club v. United States,* 579 F.2d 751 (3d Cir.1978) ..........30, 33

*Pritchard v. Dow Agro Sciences*, 705 F. Supp. 2d 471 (W.D. Pa. 2010)............10

*Roberson v. City of Philadelphia*, No. CIV. A. 99-3574, 2001 WL 210294 (E.D. Pa. Mar. 1, 2001) .......................................................................................18, 19

*Soldo v. Sandoz Pharmaceuticals Corp.*, 244 F. Supp. 2d 434 (W.D. Pa. 2003)22

*United Parcel Service, Inc. v. U.S. Postal Service*, 184 F.3d 827 (D.C. Cir. 1999) ....................................................................................................................30

*United States v. Schiff*, 602 F.3d 152 (3d Cir. 2010).......................................... 9

*United States v. Vaghari*, 735 F. Supp. 2d 197 (E.D. Pa. 2010).................10, 39

**Statutes**

N.J. Stat. Ann. § 39:3-84 ..................................................................................38

**Rules**

Fed. R. Evid. 403...................................................................................1, 10, 39

Fed. R. Evid. 702.....................................................................................1, 9, 10

Fed. R. Evid. 704........................................................................................20

**Regulations**

49 C.F.R. § 393.100................................................................................................12

49 C.F.R. § 393.104................................................................................................13

49 C.F.R. § 393.106........................................................................................12, 13, 25

49 C.F.R. § 393.110................................................................................................13

49 C.F.R. § 393.114........................................................................................14, 26, 35

49 C.F.R. § 393.116................................................................................................12

49 C.F.R. § 393.118................................................................................................12

49 C.F.R. § 393.120................................................................................................12

49 C.F.R. § 393.122................................................................................................12

49 C.F.R. § 393.124................................................................................................12

49 C.F.R. § 393.126................................................................................................12

49 C.F.R. § 393.128................................................................................................12

49 C.F.R. § 393.130................................................................................................12

49 C.F.R. § 393.132................................................................................................12

49 C.F.R. § 393.136................................................................................................12

49 C.F.R. § 393.5 ...................................................................................................12

## I.     PRELIMINARY STATEMENT

Brooks Rugemer's opinions are inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[1] and subsequent cases and Federal Rules of Evidence 702 and 403.  Wabash National Corporation ("Wabash") therefore moves to preclude him from testifying at trial.

Rugemer intends to offer opinions as an expert in CDL driver actions including what a typical flatbed tractor-trailer driver would perceive with regard to bulkheads and do as a result, and more particularly what Gangell perceived and believed on the day of the accident.  But Rugemer's relevant qualifications are thin—being limited to a few months experience driving flatbed trailers (without bulkheads) for a lumber mill in 1989 and thirteen months (2002-2003) as a Safety and Training Manager at a trucking company which had 15 to 25 flatbed trailers in a 200 trailer fleet.  Moreover, Rugemer's opinions are inconsistent with the training he provided flatbed trailer operators and the behavior he observed from those drivers during 2002-2003.

Rugemer's use of terms such as "DOT approved" bulkheads and "non DOT approved" must be precluded because those terms are misleading, confusing, and are contrary to the terms used in the trucking industry.  Additionally, even though "DOT rated" and "non DOT rated" are terms that are used in the flatbed trucking

_____

[1] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

1

industry, these terms are irrelevant and inadmissible because Gangell was not using the bulkhead to secure the load, the ratings are in terms of static loads and not moving impacts, and use of a DOT rated bulkhead would not have prevented the death of Gangell.

Rugemer's opinions amount to no more than speculation and misstatements of the law and facts.  Further, his opinions are based on wrongheaded assumptions including that a DOT rated bulkhead would have prevented the accident at issue.  Rugemer's opinions all fail because of his lack of qualifications, failure to use any reliable methodology, and the opinions would not help a jury.

## II.    REVELANT FACTS AND EVIDENCE

On November 12, 2008, William Gangell was operating a tractor-trailer in the course of his employment with R.E. Pierson Construction Company (hereinafter "Pierson").  The trailer's load included eleven fifty-foot long, coated PZ-35 double sheet pilings, with each piling weighing 6,640 pounds for a total weight of 73,040 pounds.  (The pilings will be referred to as "beams" or "sheets.")  When Mr. Gangell came to an emergency stop because the car in front of him was making a left turn, the steel beams slid forward collapsing a bulkhead[2] on the front

---

[2] The terms "bulkhead" and "headerboard" are generally interchangeable, and refer to a structure that could be at the front of a flatbed trailer, although a flatbed trailer is not required to have a bulkhead.  Truck-tractors often have what is referred to as a headache rack, cab shield, or cab protector situated immediately behind the cab of the truck-tractor.  Either a bulkhead or headache rack could have been used by a

of the trailer and intruding into the cab of the tractor, pinning Gangell inside, and eventually resulting in his death.

After an investigation by the police, Pierson was cited for an overloaded tractor-trailer. The tractor-trailer and load weighed 103,000 pounds, 23,000 pounds over the state limit of 80,000 pounds. Additionally, the investigating State Police Officer documented several violations of the Federal Motor Carrier Safety Regulations which Gangell and Pierson were required to follow.

Plaintiff is exclusively pursuing a failure to warn claim against Wabash, having abandoned all other claims. Plaintiff alleges that Wabash should have labeled the bulkhead on the trailer with a warning that it was not DOT rated[3] and did not provide cab protection, but plaintiff is not presenting any evidence that a DOT rated bulkhead would have changed the outcome of the accident or prevented Gangell's death.

Because it is well known that heavy cargo may shift or slide if not properly secured, the federal government and the state of New Jersey have promulgated extensive rules and regulations for motor carriers and commercial drivers to prevent against the shifting and falling of cargo. In essence, plaintiff is attempting to shift the legal obligation in regard to preventing against shifting loads from

---

motor carrier or truck driver to comply with the regulatory requirement for a front-end structure that were in effect prior to the amendments propounded in 2002.

[3] The proposed warning actually uses the following nonsensical language: "This model Bulkhead is NOT FMCSR-DOT compliant."

3

motor carriers and commercial drivers upon whom it has been placed, to trailer manufacturers.

Since at least 1973, the rules and regulations have recognized that front end structures, including bulkheads, should not be relied upon to withstand moving or dynamic loads, and therefore, the regulations set strength requirements based on static loads only and required additional methods of securement when cargo was not placed directly against a front end structure. In 2002, the regulations related to protection against shifting and falling cargo were amended after a great deal of research and public comment. The new regulations changed the rule related to front end structures so that the strength requirements for front end structures were only applicable if cargo was placed up against and in contact with the front end structure. In doing so, the Federal Motor Carrier Safety Administration publicly recognized and commented that it was unlikely that any front-end structure would provide much benefit, or save the driver, if heavy cargo on a trailer began to move forward.

Gangell's employer, Pierson, had a conditional rating from the Department of Transportation as a result of its safety practices and record. Pierson ignored repeated recommendations before Gangell's accident to train its drivers in securing of loads. Despite its drivers being repeatedly written up for uninspected vehicles, overloaded vehicles, and improperly secured cargo, Pierson failed to remedy these

deficiencies by providing proper supervision and training for its drivers.  Gangell

seemed similarly indifferent to safety warnings and regulations and appears to have

knowingly violated weight restrictions for the trailer and various warning related to

the weight and load securement on the day of the accident.

The facts above are set forth in more detail in Wabash's Brief in Support of

its Motion for Summary Judgment with citations to the evidence that are not

repeated here.[4]

Plaintiff retained "Commercial Trucking Specialist" Brooks Rugemer to

testify at trial and produced two reports from him dated August 25, 2011[5] and

November 22, 2011[6] and his curriculum vitae.[7]  Rugemer was deposed on March

28, 2012.[8]  He was a commercial truck driver for 12 years between 1982 and 1994,

followed by 11 years in administrative and management positions at various

trucking companies, before joining Robson as a professional expert in 2005,[9] but

has little experience with flatbed trailers with bulkheads.[10]

Flatbed trailers account for less than 10% of trailers on the road, so not all

---

[4] Brief in Support of Motion for Summary Judgment, Doc. 151-1, at 2-25 (PDF
pages 8-31 of 46).
[5] Rugemer Report, Ex. A.
[6] Rugemer Rebuttal Report, Ex. B.
[7] Rugemer CV, Ex. D.
[8] Rugemer Dep., Ex. C.
[9] Rugemer Report, Ex. A, at 2; Rugemer CV, Ex. D.
[10] Rugemer Dep., Ex. C, at 174-75, 95-96, 89-90, 100-02.

drivers or trucking companies have experience with them or bulkheads.[11]  As a

driver, Rugemer only hauled flatbed trailers for a three or four months in 1989 and

those trailers did not have bulkheads.[12]  Most of the trucking companies he worked

for in an administrative or management role did not have flatbed trailers.[13]  He

only provided input on the purchase of flatbed trailers for a single project, while

working at Hahn Transportation for 13 months beginning in October 2001.  Hahn

had 200 trailers with about 15 being flatbeds when he arrived.  While he was there,

Hahn purchased an additional 12 or 13 flatbeds.[14]  Generally, he had only one other

experience in the purchase of any type of trailers, which was to research the

availability of trailers that could easily be converted from van or box trailers to

refrigerated trailers and then back again.[15]

As a "Commercial Trucking Specialist," Rugemer does not purport to be a

trailer design expert, human factors expert, or warnings expert.[16]  He lists ten broad

areas of expertise on his CV,[17] but admitted at his deposition that most of those

---

[11] Brief in Support of Motion for Summary Judgment, Doc. 151-1, at 9; ACT N.A. Commercial Vehicle Outlook, Doc. 150-19, at Appendix B.
[12] Rugemer Dep., Ex. C, at 89-90, 100-02.
[13] Rugemer Dep., Ex. C, at 95-96, 174-75.
[14] Rugemer Dep., Ex. C, at 61-63.
[15] Rugemer Dep., Ex. C, at 107-08.
[16] Rugemer Dep., Ex. C, at 163-64.
[17] "Trucking company and warehousing operation and management; Trucking and warehousing accident and injury investigations; CDL driver hiring standards – negligent retention and entrustment issues; CDL driver training, CDL driver actions; Logbooks, driver fatigue, unsafe transit times and schedules; DOT and

areas either have no relevance to this case, or even though they might, he has not been asked to offer any opinions related to those areas.  He has not been asked by plaintiff to offer opinions and has not offered opinions related to 1) trucking company operation and management, 2) trucking accident and injury investigations, 3) CDL driver training, 4) DOT and OSHA compliance, and 5) Review and Audit of DOT and OSHA Safety Programs.[18]  Out of all of his claimed areas of expertise, only one, CDL driver actions, is relevant to his proposed testimony and opinions for this case.[19]

Rugemer explained that with regard to CDL driver actions, "I am an expert in the typical actions that a CDL driver performs in the course of doing his job. That's both driving and non-driving activities."[20]  But even within the area of CDL driver's actions, Rugemer was limited by what he was asked to do.  He did not consider Gangell's actions with regard to a pre-trip inspection or whether Gangell properly secured his load or overloaded the trailer.[21]  A review of his report makes clear that he did not consider whether Gangell's actions complied with DOT regulations, although when asked at the deposition, he admitted Gangell's actions

OSHA compliance; Industrial truck (forklift) accidents, loading dock accidents; Cargo and property claims (theft, damage) investigations; Review and Audit DOT and OSHA Safety Programs; Accident and injury reduction programs."  Rugemer CV, Ex. D.
[18] Rugemer Dep., Ex. C, at 26-42.
[19] Rugemer Dep., Ex. C, at 42.
[20] Rugemer Dep., Ex. C, at 31.
[21] Rugemer Dep., Ex. C, at 164-65, 198-99.

did not comply in many respects.[22]  Instead, the purpose of his report was "to set

forth the significance of warnings, labels, weight ratings, and proper component

information within the trucking industry, including the reasonable expectations of

tractor trailer operators and carriers."[23]  At his deposition he further explained:

"My scope was to opine on what the typical driver would think and believe

reasonably faced with these conditions and this scenario."[24]

Expert opinions from Rugemer have previously been held by courts to be

inadmissible as unreliable and irrelevant.[25]  In this case, as explained below in

more detail, the opinions set forth in his reports tend to amount to incorrect legal

conclusions, speculation and mind reading, or are inconsistent with his own

deposition testimony or his own limited experience with flatbed trailers.

## III.   ARGUMENT

### A.   Standards for admissibility of expert testimony

The admissibility of testimony by experts is governed by the *Daubert*

---

[22] *Compare* Reports, Ex. A and B *with* Rugemer Dep., Ex. C, at 144-53.

[23] Rugemer Report, Ex. A, at 1.

[24] Rugemer Dep., Ex. C, at 198.

[25] *See Larson v. United Natural Foods W., Inc*., No. CV-10-185-PHX-DGC, 2011 WL 3267316, *5 (D. Ariz. July 29, 2011) ("UNFI rightly objects on the grounds that Mr. Rugemer impermissibly offers legal conclusions and has established no indicia of reliability for his purported 'findings' concerning UNFI's decision to terminate Larson. UNFI also notes, correctly, that whether it was 'required' to terminate Larson is not material to the disability discrimination claims." (citations omitted)); *cf. Badalamenti v. Simpkiss*, 27 A.3d 191, 200-01 (N.J. Super. App. Div. 2011) (rejecting theory of liability supported by Rugemer).

standard,[26] as refined in subsequent cases and Federal Rule of Evidence 702.[27]

Admissibility "'has three major requirements: (1) the proffered witness must be an

expert, i.e., must be qualified; (2) the expert must testify about matters requiring

scientific, technical or specialized knowledge [i.e., reliability]; and (3) the expert's

testimony must assist the trier of fact [i.e., fit].' 'Under the Federal Rules of

Evidence, a trial judge acts as a gatekeeper to ensure that any and all expert

testimony or evidence is not only relevant, but also reliable.'"[28] The reliability

prong of the three-pronged test "excludes opinions based on subjective belief or

speculation; the opinion instead must 'reliably flow from the facts known to the

expert and the methodology used.'"[29] Expert testimony must be excluded if the

expert "used little, if any, methodology beyond his own intuition."[30] Additionally,

even if an expert has sufficient expertise to meet the qualifications prong of the

admissibility test, "thin qualifications" of an expert can be considered in the

---

[26] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).
[27] Fed. R. Evid. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.").
[28] *United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (alterations in original) (citations omitted).
[29] *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 439 (D.N.J. 2009).
[30] *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000).

evaluation of reliability.[31]  Expert testimony that is admissible pursuant to Rule

702 is also subject to balancing analysis under Rule 403.[32]  The burden is on the

proponent of expert testimony to prove admissibility.[33]  In the advisory committee

notes to the 2000 amendment of Rule 702 it is noted that "the amendment does not

distinguish between scientific and other forms of expert testimony.  The trial

court's gatekeeping function applies to testimony by any expert."[34]  Additionally,

"the amendment rejects the premise that an expert's testimony should be treated

more permissively simply because it is outside the realm of science."[35]

###    B.    Evidence about DOT-rated bulkheads and DOT-rated front end structures is irrelevant, misleading, does not fit the facts of this case, and cannot be permitted

Before addressing specific opinions of Rugemer, his use of inflammatory,

irrelevant, prejudicial, and improper terms must be addressed.  Plaintiff cannot be

permitted to introduce evidence, through Rugemer or otherwise, about "DOT-

compliant," "DOT-approved," "non-DOT-compliant," "non-DOT-approved," or

"FMCSR-DOT compliant" bulkheads or front-end structures because these terms

are not used in the trucking industry, the DOT does not approve bulkheads or front

---

[31] *Elcock v. Kmart Corp.*, 233 F.3d 734, 749 (3d Cir. 2000).

[32] *United States v. Vaghari*, 735 F. Supp. 2d 197, 205-06 (E.D. Pa. 2010) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746-47 (3d Cir. 1994)).

[33] *Oddi*, 234 F.3d at 144; *Pritchard v. Dow Agro Sciences*, 705 F. Supp. 2d 471, 476 (W.D. Pa. 2010).

[34] Fed. R. Evid. 702, advisory committee notes.

[35] *Id.*

end structures, and while a motor carrier or driver may be non-compliant with Federal Motor Carrier Safety Regulations, a bulkhead cannot be. Additionally, in this case there is no evidence that either Gangell or Pierson failed to comply with the FMCSR (Federal Motor Carrier Safety Regulations) by using the bulkhead as it was used (although they violated the FMCSR in other ways).

Additionally, any suggestion Rugemer that a DOT rated bulkhead would withstand the impact of a moving load is false, irrelevant, misleading, prejudicial, and unreliable. Similarly, mentions of DOT-rated, DOT-compliant, or DOT-approved bulkheads also falsely imply that the subject bulkhead was prohibited by the Department of Transportation or violated some DOT regulation. To the contrary, the static load ratings are only "applicable to commercial motor vehicles transporting articles of cargo that are in contact with" a bulkhead, which was a method of securing cargo that was not employed by Gangell or Pierson. Plaintiff's own experts concluded that the tragic outcome of the incident would not have been different even if the subject trailer had a DOT-rated bulkhead at the time of the incident,[36] making discussion of DOT-rated bulkheads irrelevant and misleading.

### 1. Applicable cargo securement regulations

Motor carriers and drivers are regulated by the Federal Motor Carrier Safety Regulations. These regulations do not apply to vehicle manufacturers. The

---

[36] *See* Harris Dep., Doc. 150-37, at 270, 272-74, 308-10.

Federal Motor Carrier Safety Regulations contain cargo securement regulations that specify how motor carriers and drivers are required to secure cargo to ensure safety.[37]  The cargo securement regulations suggest that almost any cargo that can be moved can be safely secured and transported, including logs,[38] dressed lumber,[39] metal coils,[40] paper rolls,[41] concrete pipe,[42] intermodal containers,[43] vehicles,[44] crushed vehicles,[45] and large boulders.[46]

Motor carriers and drivers are required to ensure that cargo is "firmly immobilized or secured on or within a vehicle."[47]  Motor carriers and drivers are permitted to use tiedowns or other methods to secure cargo.[48]  If tiedowns are used, motor carriers and drivers must ensure that the tiedowns' aggregate working load limit is at least one-half times the weight of the cargo being secured.[49]  The

---

[37] *See* 49 C.F.R. §§ 393.100 - 393.136.
[38] *See* 49 C.F.R. § 393.116.
[39] *See* 49 C.F.R. § 393.118.
[40] *See* 49 C.F.R. § 393.120.
[41] *See* 49 C.F.R. § 393.122.
[42] *See* 49 C.F.R. § 393.124.
[43] *See* 49 C.F.R. § 393.126.
[44] *See* 49 C.F.R. § 393.128 (automobiles, light trucks, and vans) and 49 C.F.R. § 393.130 (heavy vehicles, equipment, and machinery).
[45] *See* 49 C.F.R. § 393.132.
[46] *See* 49 C.F.R. § 393.136.
[47] 49 C.F.R. § 393.106(b).
[48] 49 C.F.R. § 393.106(b).  A tiedown is defined as "[a] combination of securing devices which forms an assembly that attaches articles of cargo to, or restrains articles of cargo on, a vehicle or trailer, and is attached to anchor point(s)."  49 C.F.R. § 393.5.
[49] 49 C.F.R. § 393.106(d).

regulations describe how to determine the working load limit of tiedowns.[50]  Motor

carriers and drivers are prohibited from using damaged securement devices.[51]

"Edge protection must be used whenever a tiedown would be subject to abrasion or

cutting at the point where it touches an article of cargo.  The edge protection must

resist abrasion, cutting and crushing."[52]

 In addition to the requirements for tiedowns based on the weight of the

cargo, the regulations specify the minimum number of tiedowns that must be used

depending on the length of the cargo being secured.[53]  If cargo *is not positioned*

*against a bulkhead* (or similar device) to prevent movement, motor carriers and

drivers are required to use at least "[t]wo tiedowns if the article is longer than 10

feet, and one additional tiedown for every 10 feet of article length, or fraction

thereof, beyond the first 10 feet of length."[54]  If cargo *is positioned against a*

*bulkhead* (or similar device) *to prevent movement in the forward direction*, motor

carriers and drivers are required to use at least one tiedown for every 10 feet in

length.[55]  If cargo *is positioned against a bulkhead* (or similar device) less than 6

feet in height, the bulkhead must be capable of withstanding a horizontal forward

---

[50] 49 C.F.R. §§ 393.106(d), 393.108.
[51] 49 C.F.R. § 393.104(b).
[52] 49 C.F.R. § 393.104(f)(4).
[53] 49 C.F.R. § 393.110(a).
[54] 49 C.F.R. § 393.110(b)(3) (metric equivalents omitted).  The requirements to secure articles less than or equal to 10 feet not positioned against a bulkhead are contained in 49 C.F.R. §§ 393.110(b)(1) and (b)(2).
[55] 49 C.F.R. § 393.110(c).

static load equal to one-half of the weight of the cargo, evenly distributed as more specifically described in the regulations.[56]  The strength requirements for bulkheads only apply if cargo is in contact with the bulkhead.[57]  There are no strength requirements for bulkheads that are not in contact with cargo in any regulation.

## 2.    Bulkhead static load ratings

Manufacturers sell bulkheads that are intended to be used to prevent forward movement of cargo pursuant to 49 C.F.R. § 393.110 and § 393.114, and bulkheads that are not intended for that purpose.  Bulkheads that are intended to be used to prevent forward movement of cargo pursuant to § 393.110 and § 393.114 are commonly referred to as DOT bulkheads or DOT-rated bulkheads.  However, the Department of Transportation does not test, certify, or rate any bulkheads.  The ratings are determined by the manufacturers themselves and the manufacturers essentially certify that testing has been completed to confirm the bulkhead can withstand a certain static load to allow motor carriers to use the bulkhead to meet the requirements set forth in § 393.114(c).

Strength ratings can be expressed in two different ways.  A manufacturer could express that a bulkhead could withstand a certain static load.  Alternatively, a manufacturer could state that a bulkhead can be used pursuant to 49 C.F.R. §

---

[56] 49 C.F.R. § 393.114(a), (c).
[57] 49 C.F.R. § 393.114(a).

14

393.114(a) for cargo with a certain maximum weight.  For example, a bulkhead less than six feet in height that can withstand a forward static load of 20,000 pounds could have its rating expressed as a 20,000 pound static load rating or as rated for 40,000 pounds of cargo.

Unrated bulkheads are commonly available from most manufacturers as demonstrated more fully in a later section, which Rugemer admitted.[58]

### 3.    There are no ratings for protection from a dynamic impact

Based upon information and belief, there is not and has never been a rating for bulkheads that expressed a rating in terms of a dynamic impact.  Every rating has been expressed in terms of being able to withstand a static load.

Understanding the difference between a static load and a dynamic impact is essential to understanding this issue.  A static load can be illustrated by the weight (i.e., force or load) of a small stone placed on your head.  A dynamic load can be illustrated by the force inflicted on your head if the same small stone was dropped off the Empire State Building and hit you in the head, or alternatively, moving because it had been propelled from a sling shot.  As another example, one of Plaintiff's withdrawn experts determined that a bulkhead that could withstand over 54,000 pounds of static load would be destroyed by a 6,600 pound beam if that beam hit the bulkhead with a relative speed of 1.43 miles per hour (25.2 inches per

---

[58] *See* Rugemer Dep., Ex. C, at 174.

second), which were the conditions that expert assumed to have occurred during Gangell's accident.[59] There are no ratings for bulkheads in terms of dynamic impact; rated bulkheads only have a rating of the bulkhead's ability to withstand a static load.

### 4. A different bulkhead would not have changed the outcome

Plaintiff's and Rugemer's implication that a DOT-rated bulkhead would have protected Gangell is unsupported and contrary to the evidence of this case. Plaintiff's (now withdrawn) engineering expert, R. Dean Harris, P.E., M.E., calculated that an alternative bulkhead that would have been sufficient for a cargo load of over 100,000 pounds would have completely failed and fractured if it was impacted with a single steel beam that weighed 6,600 pounds under the conditions of the incident.[60] Think about that, a single 6,600 pound beam would have destroyed a bulkhead designed for use with 100,000 pounds of cargo. This illustrates the irrelevance of static load ratings to protection from dynamic loads.

Plaintiff's argument that Gangell and Pierson should have been warned to use a DOT-rated bulkhead is similar to the argument that a glass door would provide more protection from a battering ram than a screen door. In the end, it is irrelevant to argue that a DOT-rated bulkhead would have provided "more"

---

[59] Harris Dep., Doc. 150-37, at 270, 272-74, 308-10; Harris's Appendix II (Calculations) to his report, Exhibit E.
[60] *Id.*

protection if it would not have provided sufficient protection to have changed the

outcome by preventing Gangell's death.

**C.    Rugemer cannot be permitted to testify about his speculation about what Mr. Gangell thought or believed**

Rugemer provides an opinion on what Gangell, a man he never met,

believed before he died.  Rugemer's inadmissible opinions in which he speculates

about what Gangell thought and believed include the following:

- o "Mr. Gangell . . . (and RE. Pierson) reasonably **believed** that the Wabash bulkhead was designed to provide protection for loads shifting on the heavy duty (100,000 lbs.) trailer to which it was attached."[61]

- o "The lack of any warnings, labels, diagrams, placards, or other language or graphical depiction on the subject bulkhead caused Mr. Gangell (and RE. Pierson) to reasonably **believe** that it was a DOT rated front end structure."[62]

- o "The lack of any warnings, labels, diagrams, placards, or other language or graphical depiction on the subject bulkhead caused Mr. Gangell (and R E. Pierson) to reasonably **believe** that it was designed and manufactured in a manner in which it would protect drivers from shifting loads provided the load was within the trailer's GVWR."[63]

- o "The lack of any warnings, labels, diagrams, placards, or other language or graphical depiction on the subject bulkhead caused Mr. Gangell (and RE. Pierson) to reasonably **believe** that no additional front end structures were needed in order to safely transport a load on the trailer, and thus resulted in Mr. Gangell

---

[61] Rugemer Report, Ex. A, at 5-6 (emphasis added).
[62] Rugemer Report, Ex. A, at 6 (emphasis added).
[63] Rugemer Report, Ex. A, at 6 (emphasis added).

using a tractor that was not equipped with a cab shield or headache rack."[64]

All of the conclusions that Rugemer listed as his conclusions in his report include his opinion about what Gangell and Pierson believed prior to his death.  Such speculation cannot be admitted at trial.

### 1. Rugemer is not qualified to testify about what Gangell and Pierson thought or believed (Qualifications)

Rugemer does not have any expertise that would permit him to testify about what Gangell thought before his death, or what he believed, or what his intent was, or otherwise testify about the supposed mind-set of Gangell.[65]  Rugemer did not know Gangell, and does not claim to have any mind-reading ability or psychological or psychic training.

### 2. Rugemer's speculation about what Gangell believed did not employ a reliable methodology (Reliability)

Rugemer's opinions on what Gangell believed are nothing more than

---

[64] Rugemer Report, Ex. A, at 6 (emphasis added).

[65] *See Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 443 (D. Del. 2004) ("She will not, however, be permitted to testify . . . regarding Mergen's intent, motive, or state of mind, or evidence by which such state of mind may be inferred."); *Roberson v. City of Philadelphia*, No. CIV. A. 99-3574, 2001 WL 210294, *4 (E.D. Pa. Mar. 1, 2001) ("Waters is not a psychologist; he has no basis for his conclusions regarding the Daniels' reaction to Pelosi's actions or their arrest."); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liab. Litig.*, No. MDL 1203, 2000 WL 876900, *12 (E.D. Pa. June 20, 2000) ("The court can easily preclude, from a *Daubert* viewpoint, the rendering of opinions by either of these witnesses . . . as to what doctors in general think, because the witnesses are not qualified for that.").

speculation unsupported by any evidence.  "An expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation."[66]  Rugemer has not identified any methods or procedures that he employed to come to the conclusions about what Gangell believed.[67]  Nor can any methods or procedures allow any expert to divine what someone else thought or believed.  Rugemer therefore cannot be permitted to testify as to Gangell's supposed beliefs.

### 3.    Rugemer's speculation about Gangell's beliefs would not assist a trier of fact in this case (Fit)

#### a.    Speculation can never assist a jury

Rugemer's opinions on Gangell's beliefs fail the fit prong of the *Daubert* test.  Courts have consistently held that an expert's speculation as to what someone else thought would not aid the jury in determining a material fact.[68]  Additionally,

---

[66] *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000) (quotation marks omitted).

[67] *See Roberson*, 2001 WL 210294, at *4 ("Waters provides no basis for his speculation as to what the D.A. or the bail commissioner would have done.").

[68] *See Floorgraphics, Inc. v. News Am. Mktg. In-Store Services, Inc.*, 546 F. Supp. 2d 155, 179-80 (D.N.J. 2008); *Holman Enterprises v. Fid. & Guar. Ins. Co.*, 563 F. Supp. 2d 467, 472 (D.N.J. 2008); *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 443 (D. Del. 2004); *Roberson v. City of Philadelphia*, No. CIV. A. 99-3574, 2001 WL 210294 (E.D. Pa. Mar. 1, 2001) (prohibiting an expert from speculating as to other people's states of mind); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liab. Litig.*, No. MDL 1203, 2000 WL 876900, *9 (E.D. Pa. June 20, 2000) ("The question of intent is a classic jury question and not one for experts, and clearly not these experts."); *cf.* Fed. R. Evid. 704(b) ("In a criminal case, an expert witness must not state an opinion about

"testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the fact-finder."[69]  As a matter of law, Rugemer's speculation about what Gangell thought or believed or would have done or about Gangell's motivations or intentions is inadmissible.

### b. Contrary to Rugemer's speculation, Gangell would not have heeded a warning

Whether Gangell would have heeded a warning must be determined from the evidence, not an expert's baseless testimony.  All the evidence establishes that he would not have heeded any warning.  In this case, the evidence is so clear that Gangell and Pierson would not have changed any practice regardless of any warning on the bulkhead that the Court can decide the issue of causation in Wabash's favor as a matter of law.[70]  Regardless, the jury or the Court would not be aided by Rugemer's speculation.

---

whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone.").

[69] *Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.*, No. CIV.A. 01-669-KAJ, 2004 WL 1534786, *2 (D. Del. May 21, 2004).

[70] *See Calderon v. Machinenfabriek Bollegraaf Appingedam BV*, 667 A.2d 1111, 1116 (N.J. Super. App. Div. 1995) (holding that a jury could not have found that an employer would have heeded a warning about a missing safety device because the evidence was so strong that the employer would ***not*** have heeded a warning), *cert. denied*, 675 A.2d 1122 (N.J. 1996).  *See also* Brief in Support of Motion for Summary Judgment, Doc. 151-1, at 15-25, 31-32.

          **c.**    **Rugemer's speculation about whether a warning would have caused the use of a DOT-rated bulkhead is not probative in this case because there is no evidence that the outcome would have been different even if a DOT-rated bulkhead was used**

Rugemer's testimony is irrelevant to any issue in this case. Rugemer speculated that Gangell believed the subject bulkhead was a DOT rated front end structure. However, there is no evidence that a DOT rated bulkhead would have changed the outcome of the case. One of plaintiff's experts, who has since been withdrawn, admitted that an alternative design for a bulkhead that would have been rated to withstand 54,500 pounds of static load, would not have made a difference. Mr. Gangell still would have died.[71] There is no evidence to the contrary. Rugemer's speculation therefore does not fit the facts of the case.

          **D.**    **Rugemer cannot be permitted to testify about ordinary knowledge common to end-users of flatbed trailers or his beliefs about what a typical flat-bed truck-tractor/trailer driver would think**

Rugemer's report contains inadmissible opinions about what is known by users of flatbed trailers. He supposes "that a significant segment of the trucking industry is not aware of the potential dangers that result from unknowingly using a non DOT approved bulkhead."[72] He also speculates about what a driver can

---

[71] Brief in Support of Motion for Summary Judgment, Doc. 151-1, at 13-15, 29-30; Harris Dep., Doc. 150-37, at 270, 272-74, 308-10.

[72] Rugemer Report, Ex. A, at 5.

determine about the "performance characteristics of a bulkhead."[73]  These opinions

must be excluded.

### 1.   Rugemer is not qualified to opine about what is known to a typical flat-bed truck-tractor/trailer driver (Qualifications)

Rugemer has no experience as a driver of a flatbed trailer with a bulkhead

and very little experience with flat-bed trailers in his career, and cannot qualify as

an expert on what a typical driver of a flatbed trailer with a bulkhead would know

or expect.  "Before being permitted to give opinion testimony on a particular

subject, a witness must be 'qualified' as an expert on that subject."[74]  "[T]he

criteria required to qualify an expert turn largely upon the subject matter of the

particular opinion to be offered."[75]  A person "cannot qualify as an expert generally

by showing that the expert has specialized knowledge or training which would

qualify him or her to opine on some other issue."[76]  Although Rugemer has

experience that would qualify him to testify about certain aspects of the trucking

---

[73] Rugemer Report, Ex. A, at 5 ("Without clear language and warnings from the manufacturer, it is unreasonable to expect a driver to be able to appropriately determine the correct performance characteristics of a bulkhead, and this can result in injury or death.").

[74] *Soldo v. Sandoz Pharmaceuticals Corp.*, 244 F. Supp. 2d 434, 568 (W.D. Pa. 2003).

[75] *Kerrigan v. Maxon Ind.*, 223 F. Supp. 2d 626, 635 (E.D. Pa. 2002).

[76] *In re Diet Drugs*, No. MDL 1203, 2001 WL 454586, *7 (E.D. Pa. Feb. 1, 2001); *see also Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003) ("An expert may be generally qualified but may lack qualifications to testify outside his area of expertise.").

industry, he lacks the expertise to present the opinions that are contained in his report.

### a.    Rugemer does not have sufficient experience

Rugemer has admitted that he does not have much experience with flatbed trailers or bulkheads.  He testified that, when he was a driver, he hauled flatbed trailers only "for a very short period" of a "few months, three, four months perhaps" in 1989 when he "worked for a local lumber mill as a driver."[77]  The flatbed trailers that he hauled did not have bulkheads on them.[78]  This experience hauling flatbed trailers occurred more than 20 years ago,[79] during which time he hauled lumber and never hauled steel on a flatbed trailer.[80]  His only other experience with flatbed trailers was in the conduct of being employed at Hahn Transportation as Safety and Training Manager for approximately one year.  He was never involved with flatbed trailers after leaving Hahn Transportation in 2002.[81] This was his explanation for why he was not aware of the changes to the regulations related to flatbed trailers and front end structures.[82]

Rugemer claimed in his reports that he had significant experience

---

[77] Rugemer Dep., Ex. C, at 89; *see also id.* at 101-02.
[78] *Id.* at 89.
[79] *Id.* at 101.
[80] *Id.* at 102-03.
[81] *Id.* at 123, 174-75, 60; Rugemer CV, Ex. D.
[82] Rugemer Dep., Ex. C, at 113-15, 121-24.

purchasing flatbed trailers and bulkheads,[83] but in fact, he had very limited experience doing so.  The way he phrased it in his reports, Rugemer "selected and purchased components (including bulkheads) for flatbed trailer fleets,"[84] and that he "was routinely provided with a range of DOT rated bulkheads" when purchasing bulkheads.[85]  He boasted of "significant experience purchasing commercial equipment including trailers."[86]  However, he admitted at his deposition that his only experience purchasing flatbed trailers or bulkheads while employed at Hahn was for use in a single project.[87]  For that project, Hahn purchased 12 or 13 flatbed trailers with bulkheads that were bid upon pursuant to a request for proposal that contained specifications.  Rugemer was one of several people at Hahn that had input in creating the specification for the request for proposal.[88]  Other than that experience, Rugemer never purchased flatbed trailers or bulkheads.[89]

    **b.**    **Rugemer displayed ignorance of relevant regulations**

    In addition to his lack of experience with flatbed trailers, Rugemer displayed

---

[83] *See* Rugemer Report, Ex. A, at 4; Rugemer Rebuttal Report, Ex. B, at 4.
[84] Rugemer Report, Ex. A, at 4.
[85] Rugemer Rebuttal Report, Ex. B, at 4.
[86] *Id.*
[87] Rugemer Dep., Ex. C, at 61-63, 174-75.
[88] *Id.* at 62-63.
[89] *Id.* at 95, 174-75.  As discussed above, his only other experience purchasing any type of trailer was researching the availability of a certain type of convertible van trailer.

ignorance or an incorrect understanding of the regulations that apply to flatbed

trailers.  Rugemer did not know how a motor carrier or a driver could comply with

§ 393.110 and § 393.114 through use of a rated bulkhead, as the following

testimony shows:

> Q. Do you know what the regulations require with regard to a static
> load rating for a bulkhead when the load is up against the
> bulkhead?
> A. For load securement purposes?
> Q. Sure.
> A. I believe it must withstand a .5 g or a .7 g -- I'm sorry; I don't
> recall -- forward movement of the load.
> Q. And do you know what that translates into with regard to
> pounds?
> A. No, I do not.[90]

This testimony demonstrates that Rugemer does not know information that every

motor carrier or driver hauling a flatbed trailer and using a bulkhead for

securement purposes is required to know.  Additionally, this testimony

demonstrates that Rugemer does not understand that the regulations, and a static

load rating, do not address "forward movement of the load."  The regulations

require that cargo be firmly secured to prevent movement[91] and specify a minimum

strength for bulkheads (applicable only "to commercial motor vehicles transporting

articles of cargo that are in contact with the front end structure of the vehicle")

---

[90] Rugemer Dep., Ex. C, at 76.
[91] 49 C.F.R. § 393.106(b).

expressed in static load.[92]  As the name indicates, a "static" load does not entail movement.

Rugemer's lack of qualifications is also clear in his failure to understand basic principles about the manufacture and sale of trailers and the manner in which the Department of Transportation regulates the manufacture and use of vehicles. He suggests in his reports that every component part installed on a trailer has to meet a DOT requirement,[93] but this simply is not true.  The Federal Motor Vehicle Safety Standards (FMVSS) contain requirements related to the manufacture of trailers, but not with regard to every component of a trailer.  The Federal Motor Carrier Safety Regulations (FMCSR) contain requirements with regard to what a motor carrier and driver can have and cannot have on a tractor-trailer, but again not with regard to every component on a tractor-trailer.  Neither the FMVSS nor the FMCSR list approved bulkheads, nor does the DOT approve bulkheads.  When pressed to identify the requirements related to certain components of a trailer, Rugemer could not do so, and eventually admitted that there was no regulation that precluded a non-DOT rated bulkhead from being on a trailer.[94]

---

[92] 49 C.F.R. § 393.114.

[93] *See* Rugemer Report, Ex. A (referring throughout to a DOT approved bulkhead although there is no such thing); Rugemer Rebuttal Report, Ex. B, at 1-2 ("when these components are installed on a commercial vehicle, they must meet DOT requirements") (also claiming there is no non-DOT approved lighting component on any commercial vehicle).

[94] Rugemer Dep., Ex. C, at 191-95.

> c.   **Rugemer's lack of familiarity with unrated bulkheads displays his own lack of qualifications rather than industry-wide unfamiliarity**

Rugemer opines about bulkheads even though he admitted that he did not know before his involvement in this case that non-DOT-rated bulkheads even existed, but after some research realized they were common.[95]  This ignorance displays his lack of qualifications.  Non-DOT-rated bulkheads are widely available from many manufacturers.  Rugemer testified that Hahn purchased trailers (with bulkheads) from Utility.[96]  Utility's website prominently lists "Factory-installed D.O.T. and non-D.O.T. Rated Bulkheads" as options for its flatbed trailers.[97]

One of Plaintiff's (now withdrawn) experts included as an exhibit to his report a collection of website printouts that he gathered in "market research" of bulkheads.[98]  These printouts reflect how common non-DOT-rated bulkheads are. The printout from Aero Industries state that "The Conestoga 2 bulkhead also

---

[95] *See* Rugemer Dep., Ex. C, at 174, which reads as follows:
>    Q.   From your search did you determine that in fact manufacturers make both DOT-rated bulkheads and nonDOT-rated bulkheads?
>    A. Yes.
>    Q.   Do you now know that there is nothing uncommon about that?
>        MR. EISENBERG:  Objection.
>        THE WITNESS:  Absolutely, yes.
>        I admitted it from the first day I was involved in this case, I was not aware that there was a nonDOT-rated bulkhead.

[96] Rugemer Dep., Ex. C, at 62.

[97] Utility Website Screen Capture, Doc. 150-26.

[98] *See* the "Market Research" appendix to the report of R. Dean Harris, Doc. 150-28, Doc. 150-29, Doc. 150-30.

provides safety and convenience, with a DOT rating of 50,000 pounds and a non-DOT model with access door is also available."[99]   A printout from Load Covering Solutions Inc. advertises a "Flat Aluminum Bulkhead, -Non DOT w/ 4 Post 48"/60"/72"."[100]   A printout from Sturdy Lite identifies a picture of bulkhead as "Aluminum Flat Non-DOT."[101]

David A. Kemp, P.E., further supports the conclusion that non-DOT rated bulkheads are common.  In his report, Kemp writes as follows:

> The fact that non-D.O.T. rated bulkheads are common in the trailer industry is clearly seen in the industry literature provided by the expert reports of both James Middleton and Dean Harris.  Both of these gentlemen provide literature published by Sturdy-lite, a manufacturer of trailer bulkheads.  In this literature, Sturdy-lite has pictures and descriptions which refer to both D.O.T. rated and non-D.O.T. rated bulkheads.  In addition, they both provide literature published by Load Armour Truck & Trailer Equipment, another manufacturer of trailer bulkheads.  In this literature, both D.O.T. rated and non-D.O.T. rated bulkheads are presented.  In addition, Harris provides literature published by Aero Industries, another manufacturer of trailer bulkheads.  Again, this literature clearly describes both D.O.T. rated and non-D.O.T. rated designs of their Conestoga 2 bulkhead.  Harris also provides internet published pages of Dorsey Trailers which show examples of trailers with D.O.T. rated bulkheads, non-D.O.T. rated bulkheads, and even trailers with no bulkhead installed.  The writer was personally the VP of Engineering for Dorsey Trailers for 10 years.  All throughout that time, Dorsey Trailers offered both D.O.T. rated and non-D.O.T. rated bulkheads.  Having much direct contact with customers, the writer understood that the customers commonly knew about all types of bulkheads.  While the experts did not refer to other trailer manufacturers, the website of

---

[99] Doc. 150-28, at 3.
[100] Doc. 150-30, at 2.
[101] Doc. 150-30, at 5.

> Utility Trailer, one of the largest trailer manufacturers in the country,
> offers both D.O.T. rated and non-D.O.T. rated bulkheads.  The
> evidence is overwhelming that both D.O.T. and non-D.O.T. rated
> bulkheads are common in the trailer industry and anyone holding
> themselves out as an expert, including Rugemer, should be well aware
> of these designs.[102]

Kemp's deposition testimony further supported the conclusion that non-DOT rated

bulkheads are common.  He testified that, while he was employed by Great Dane,

Great Dane sold bulkheads that were not DOT rated.[103]

At his deposition, Rugemer finally admitted that unrated bulkheads are not

uncommon.  The market research of Plaintiff's own experts, and the report of

David Kemp further support the conclusion that unrated bulkheads are common.

Because unrated bulkheads are common in the industry, Rugemer's lack of

familiarity with them requires that he be found unqualified to testify at trial.

### 2.    Rugemer did not use reliable methods to determine what a typical user of a flat-bed trailer knew (Reliability)

Rugemer identified no reliable principle or method that he employed to

reach his conclusions on what a typical user of flat-bed trailer would have known

or what a reasonable user would have done.  The bases for his conclusions consist

of an unreliable sampling, hearsay, and speculation.

Rugemer's "sampling" fails to satisfy the requirements for a survey that

could support an admissible expert opinion.  A survey or poll must be conducted in

---

[102] Kemp Report, Doc. 150-21, at 4-5.
[103] Kemp Dep., Doc. 150-27, at 37.

accordance with generally agreed upon survey principles to be deemed reliable.[104]

Elements of a reliable survey "include the following: (1) a proper universe must be

examined and a representative sample must be chosen; (2) the persons conducting

the surveys must be experts; (3) the data must be properly gathered and accurately

reported; (4) the sample design, the questionnaires and the manner of interviewing

must meet the standards of objective surveying and statistical techniques; (5) the

survey must be conducted independently of the attorneys involve[d] in the

litigation; and (6) the interviewers ideally should be unaware of the purposes of the

survey or litigation."[105] "'The validity of a survey's results is undermined if the

sample is not representative of the population that it purports to represent *or is not

selected in a sufficiently random manner.*'"[106]

Rugemer's "sampling" fails to meet the standard to be deemed reliable.  His

entire sample consists of four people, who were all somehow connected to the

incident.

> Q.   In the first full paragraph [of page 5 of Rugemer's Report] you
> say:  "From the sampling of individuals who work closely with
> trailers and bulkheads, it is reasonable to extrapolate that a
> significant segment of the trucking industry is not aware of the
> potential dangers that result from unknowingly using a nonDOT-

---

[104] *Pittsburgh Press Club v. United States,* 579 F.2d 751, 758 (3d Cir.1978).

[105] *Floorgraphics, Inc. v. News Am. Mktg. In-Store Services, Inc.*, 546 F. Supp. 2d 155, 179 (D.N.J. 2008) (citing *Pittsburgh Press Club*, 579 F.2d at 758) (alteration symbols omitted).

[106] *Floorgraphics*, 546 F. Supp. 2d at 179 (quoting *United Parcel Service, Inc. v. U.S. Postal Service*, 184 F.3d 827, 840 n.14 (D.C. Cir. 1999)).

> approved bulkhead which is not a requisite for an end structure,"
> correct?
>
> A.   Yes.
>
> Q.   The sampling that you are referring to, how many people did that
>      include?
>
> A.   Mr. Donahue, Mr. Nelson, Mr. White, and Trooper Pacinik [sic].
>
> Q.   So four people?
>
> A.   Yes.[107]

The sample was not representative and was drawn mostly from a company with questionable safety practices.  There was no effort to gather a representative sample; rather, Rugemer just reviewed some transcripts of witnesses that were deposed in the course of this litigation.  Rugemer does not purport to have any expertise on surveying or statistics.[108]  None of the individuals interviewed were a driver in the same position as Gangell.  Robert Donahue was a dispatcher/transportation director for Pierson,[109] the company that employed Gangell.  Kary Nelson was a superintendent for Pierson.[110]  Waldron White was a safety director for Pierson.[111]  Blaze Pecenak was a trooper with the New Jersey State Police.[112]  None of them drive a truck as a primary job function.  White and Pecenak do not

---

[107] Rugemer Dep., Ex. C, at 185-86.

[108] *See* Rugemer Dep., Ex. C, at 164, 186-89.

[109] Donahue Dep., Ex. F, at 24-25.

[110] Nelson Dep., Ex. G, at 9, 12-13.

[111] White Dep., Ex. H, at 60.

[112] Pecenak Dep., Ex. I, at 31-34.

have commercial driver's licenses.[113]  Donahue testified that Pierson drivers were

not instructed to use a bulkhead for load securement.[114]

Rugemer also misleadingly implies that the respondents to his survey did not

know that there were bulkheads that were *in*capable of being used to secure loads,

that is, he implied the respondents did not know there were bulkheads that *were not*

DOT-rated, or for that matter, rated in any respect.  To the contrary, their

testimony suggests that they were not aware that any bulkheads *were* capable of

being used to secure loads or DOT-rated.[115]

Further, none of these individuals, nor any other witness in this case, has

testified that they would have anticipated that any bulkhead would have stopped

the steel once it began to move.

It is clear from a comparison of the elements of a reliable survey to the

qualities of Rugemer's sampling that Rugemer's sampling was unreliable.  The

sampling did not (1) include a proper universe or a representative sample must be

chosen; (2) was not conducted as part of a sampling, and was not conducted by an

expert; (3) the data was not properly gathered and accurately reported; (4) nothing

met the standards of objective surveying and statistical techniques; (5) there was

no survey conducted independently of the attorneys, only depositions conducted as

---

[113] White Dep., Ex. H, at 13; Pecenak Dep., Ex. I, at 177.
[114] Donahue Dep., Ex. F, at 32-33.
[115] *See* Pecenak Dep., Ex. I, at 142; Nelson Dep., Ex. G, at 48-49.

part of the litigation; and (6) there were no interviewers who were unaware of the purposes of the survey or litigation.[116] The "sampling" and all opinions flowing from it must be excluded.

Moreover, Rugemer's only experience with drivers who used flatbed trailers with rated bulkheads was at Hahn Transportation and is exactly opposite of his conclusions here. For example, at his deposition Rugemer admitted that Gangell used less straps than required by law to secure his load, but speculated that if Gangell had known the bulkhead was not DOT rated Gangell might have used used chains or added straps beyond the minimum number required. However, drivers at Hahn used chains and more than enough straps when using a DOT rated bulkhead, not just when they were using a trailer that did not have such a bulkhead.[117] Rugemer testified that "[m]ost of the drivers that I have managed and that I have trained would err to the side of caution on a heavy load."[118] Rugemer agreed to the following:

> Q. Would it be fair to say that drivers are trained from day one that it's critical to properly load and secure whatever type of cargo they are hauling?
> A. That's a fair statement, yes.[119]

---

[116] *See Pittsburgh Press Club*, 579 F.2d at 758; *Floorgraphics*, 546 F. Supp. 2d at 179.

[117] Rugemer Dep., Ex. C, at 134-37, 166-69, 206-11.

[118] Rugemer Dep., Ex. C, at 135.

[119] Rugemer Dep., Ex. C, at 211.

Rugemer testified that when he trained people, he told them that if their loads are not properly secured, they have a risk of being injured.[120]  He testified that it was true that drivers would exceed the minimum regardless of whether there was a bulkhead or not.[121]  Rugemer's limited experience directly contradicts his speculation that Gangell believed he did not need to meet the minimum requirements for securement because of the bulkhead.

Further, Rugemer's conclusions start with an assumption that flatbed trailer drivers generally, and the personnel at Pierson specifically, believe that a DOT rated bulkhead would stop a load of over 70,000 pounds of steel even if the steel was not up against the bulkhead and was not properly secured, but there is no evidence that supports this assumption.  No one from Pierson was surprised that the bulkhead did not stop the load.  Instead, they were taken aback by how Gangell overloaded the trailer and failed to properly secure it.[122]  The Federal Motor Carrier Safety Association and other organizations such as the American Trucking Associations have long known and publicly stated that front end structures will in fact not save a driver if a heavy load gets moving.[123]

---

[120] Rugemer Dep., Ex. C, at 206, 210-11.
[121] Rugemer Dep., Ex. C, at 136.
[122] *See, e.g.*, Donahue Dep., Doc. 150-14, at 141-47, 35-36, 39-40.
[123] *See* Brief in Support of Summary Judgment Motion, Doc. 151-1, at 6-8.

### 3. Rugemer's unreliable testimony about what might be known to a typical truck driver would not assist a jury (Fit)

Rugemer cannot be permitted to testify about what is known to a typical truck driver because such testimony would not be helpful to a jury. First, motor carriers and drivers are required by law to know the regulations and comply with the regulations. Ignorance cannot excuse any non-compliance with the law. Second, DOT-ratings, that is ratings for static loads, are irrelevant because Gangell was not "transporting articles of cargo that [were] in contact with the front end structure of the vehicle."[124] Ratings for bulkheads are only applicable in that situation and do not indicate any level of protection from an impact from a moving load. Third, it is irrelevant whether Gangell used a rated bulkhead or not because even a rated bulkhead would not have changed the outcome of the incident.

Additionally, everyone at Pierson, including Gangell, would have known that the bulkheads that were used on their trailers were not capable of stopping a heavy load that broke free because of the prior similar accident involving Phillips, another Pierson driver.[125]

### E. Rugemer cannot be permitted to imply that a DOT-rated bulkhead would have been sufficient to stop a moving steel load

Although he does not explicitly opine on a DOT-rated bulkhead's ability to withstand the dynamic impact of several dozen tons of steel, Rugemer baselessly

---

[124] 49 C.F.R. § 393.114.
[125] *See* Brief in Support of Summary Judgment Motion, Doc. 151-1, at 15-16.

35

implies that the proper bulkhead would have protected Gangell.  Among

Rugemer's inadmissible opinions are as follows:

> o "It is, therefore, reasonable for Mr. Gangell to have assumed that
> the bulkhead, supplied to him to perform his job, was sufficiently
> strong for the 100,000 lbs. trailer to which it was attached,
> particularly because the bulkhead lacked any warnings or diagrams
> that indicated to the contrary."[126]

Rugemer cannot be permitted to testify on this opinion or others that similarly

imply that a rated bulkhead would have prevented Gangell's death.

### 1.      Rugemer is not qualified to give these opinions, nor are the opinions reliable (Qualifications and Reliability)

Rugemer is not qualified to give these opinions and does not use a method

that would render the opinions reliable. Rugemer does not have any expertise in

physics, engineering, accident reconstruction, or any other field that would allow

him to opine on whether a particular bulkhead would survive a particular impact

from a moving load.  He uses no method or process that would lead to a reliable

conclusion.

### 2.      Implying that a different bulkhead could have stopped the load does not fit the facts of the case (Fit)

As previously stated, Plaintiff's (now withdrawn) expert, Harris, calculated

that an alternative bulkhead that would have been sufficient for a cargo load of

100,000 pounds would have completely failed and fractured if was impacted with a

---

[126] Rugemer Report, Ex. A, at 4.

36

single steel beam that weighed 6,600 pounds under the conditions of the incident.

Wabash's experts Dr. Tyler Kress and Dr. Nicholas J. Durisek both determined

that the bulkhead proposed by Plaintiff would have failed.[127]  Plaintiff is

completely without evidence that any alternative design for a bulkhead would have

prevented Gangell's death.  Rugemer nonetheless implies that a bulkhead that "was

sufficiently strong for the 100,000 lbs. trailer" would have prevented Gangell's

death.  Any such testimony does not fit the facts of the case and must be excluded.

### F. Rugemer cannot be permitted to testify about his beliefs about what would be reasonable

Much of Rugemer's opinions merely state his belief as to conclusions that

can be drawn from certain evidence that may be presented in this case.[128]

"[T]estimony of an expert that constitutes mere personal belief as to the weight of

the evidence invades the province of the fact-finder."[129]  He does so without expert

qualifications, reliability, or fit.  Rugemer therefore should not be permitted to

testify about his opinions about what conclusions he would draw from the

evidence.

---

[127] Kress Report, Doc. 150-40, at 6; Durisek Report, Ex. J, at 6.

[128] *See* Rugemer Report, Ex. A, at 4 ("It is, therefore, reasonable for Mr. Gangell to have assumed  . . ."), at 6 (". . . caused Mr. Gangell (and R E. Pierson) to reasonably believe . . .").

[129] *Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.*, No. CIV.A. 01-669-KAJ, 2004 WL 1534786, *2 (D. Del. May 21, 2004).

### G.    Rugemer cannot be permitted to testify or imply that Gangell was permitted to haul 100,000 pounds of cargo on the trailer

Motor carriers and drivers cannot transport more than 80,000 pounds in New Jersey without a permit.  "The maximum total gross weight imposed on the highway or other surface by a vehicle or combination of vehicles, including load or contents, shall not exceed 80,000 pounds."[130]  Permits could be issued for "transporting one piece loads that cannot be dismembered, dismantled or divided in order to comply with the weight limitations."[131]  Rugemer acknowledged that Pierson and Gangell probably would not have qualified to receive a permit for the subject load.[132]  Additionally, he acknowledged the irrelevance of the nature of the equipment to the maximum legal limit that a truck driver can legally haul.

> I could have the most heavy duty trailer they make to haul an exorbitant amount of weight, but unless I am permitted I am still limited to the 80,000-pound gross vehicle weight . . . .[133]

The gross weight of Gangell's truck, trailer, and cargo was 103,000 pounds at the time of the incident.[134]  This exceeded the legal limit by 23,000 pounds. Although Gangell was flaunting the law, Rugemer repeatedly invokes the trailer platform's 100,000 pound rating[135] while ignoring the 80,000 legal limit.  The

---

[130] N.J. Stat. Ann. § 39:3-84(b)(4).

[131] N.J. Stat. Ann. § 39:3-84(d)(1).

[132] Rugemer Dep., Ex. C, at 165-66.

[133] Rugemer Dep., Ex. C, at 73.

[134] New Jersey Police Crash Report, Document 1-9, at 18, WNC116.

[135] *See* Rugemer Report, Ex. A, at 4, 6; Rugemer Rebuttal Report, Ex. B, at 3, 6-7.

100,000 pound number is irrelevant, misleading, and prejudicial, and cannot constitute or support any reliable conclusion by an expert.  Rugemer should therefore be precluded from testifying about the 100,000 pound figure.

Further, New Jersey requires drivers not to comply with just the 80,000 pound combined gross weight limit, but also other limits, including an axle limit of 34,000 pound for tandem axles (the two rear axles on either the truck-tractor or trailer in this case).  As Wabash explained in its Brief in Support of the Motion for Summary Judgment Gangell was also violating this legal limit for axle ratings, as well as performance ratings for axle weight marked on the trailer, and the 80,000 pound limit marked on the door of the Pierson truck-tractor.[136]

### H.     The probative value of each of his opinions is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury

Even if any opinions of Rugemer were admissible under *Daubert* and Rule 702, they should be excluded as unduly prejudicial under Rule 403.  Expert testimony is subject to the balancing analysis under Rule 403 and should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.[137]  Rugemer's testimony could confuse the jury and cause the jury to give undue weight to his testimony.

---

[136] *See* Brief in Support of Summary Judgment Motion, Doc. 151-1, at 21-22.

[137] *United States v. Vaghari*, 735 F. Supp. 2d 197, 205-06 (E.D. Pa. 2010) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746-47 (3d Cir. 1994)).

Because Rugemer's testimony lacks probative value and any probative value is greatly outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury, it should be excluded from trial and not used by this Court for any purpose.

## IV.    CONCLUSION

Rugemer cannot be permitted to testify because he lacks relevant qualifications, did not use reliable methods or principles in reaching his opinions, and his testimony would not be helpful to a jury to resolve any material fact. Additionally, his opinions are contrary to law and highly prejudicial.  Therefore, Wabash's motion to preclude Rugemer from testifying at trial should be granted.

Respectfully submitted,

WARD GREENBERG HELLER & REIDY LLP

By:    */s/ Gerhard P. Dietrich*
Gerhard P. Dietrich
Paul D. Lux
1835 Market Street, Suite 650
Philadelphia, PA  19103
(215) 836-1100

Attorney for Defendant,
Wabash National Corporation