UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JESSICA DURKIN, both individually , and as Administratrix of the Estate and Administratrix Ad Prosequendum of the Estate of WILLIAM R. GANGELL, JR., Deceased, | : : : : : : | Hon. Joseph H. Rodriguez |
| Plaintiffs, | : | Civil Action No. 10-2013 |
| v. | : : | |
| WABASH NATIONAL, | : : | **OPINION** |
| Defendant. | : | |

Presently before the Court are several motions filed by the Defendant Wabash

National Corporation (hereinafter "Wabash").  Wabash moves for Summary Judgment

[Dkt. No. 149] pursuant to Fed. R. Civ. P. 56 and moves to Strike Plaintiff's Responses to

the Statement of Undisputed Facts [174] pursuant to L. Civ. R. 56.1(a).  In addition, and

in partial support of its Motion for Summary Judgment, Wabash moves to Preclude the

Testimony of Plaintiff's Experts Brooks Rugemer [Dkt. No. 152] and William Vigilante

[Dkt. No. 154] pursuant to Fed. R. Evid. 702.   Plaintiff Jessica Durkin[1] (hereinafter

"Durkin") opposes the motions.  The Court has considered the written submissions of

the parties and heard oral argument on the motions on February 20, 2013 and March 12,

2013.  For the reasons set forth below, Wabash's Motions are granted in part and denied

in part.

_____

[1] Durkin was engaged to William Gangell.  She is suing both individually and as
Administratrix of the Estate and Administratrix Ad Prosequendum of the Estate of William R.
Gangell, Jr., Deceased.

# I. BACKGROUND

## A. Procedural History and Posture

The following background is partially excerpted from the Court's Opinion in this matter on October 19, 2010. <u>Durkin v. Pacaar, Inc.</u>, No. 10-2013, 2010 WL 4117110 (D.N.J. Oct. 19, 2010).  The facts underlying this action are tragic and fairly straightforward.  On November 12, 2008, William Gangell, a New Jersey citizen, was operating a tractor-trailer loaded with a steel load in Franklin Township, New Jersey. (Compl. ¶ 6.)  The steel load shifted forward during a braking maneuver, which collapsed the bulkhead of the truck, pinning Gangell inside.  (Compl. ¶¶ 7-8.) Gangell died later that day as a result of the injuries he suffered in the accident.  (Id.)

The facts surrounding the subsequent litigation stemming from this incident are less than straightforward and the Court does not recount in full the extensive, convoluted, and much disputed procedural history.[2]  At this juncture, Wabash is the only remaining defendant in this matter and Plaintiff's sole claim against Wabash is predicated upon a failure to warn theory.  In general terms, Plaintiff's Complaint alleges that Wabash is liable for Gangell's death because it failed to warn drivers of the danger that its bulkhead did not provide any protection from shifting loads.  Specifically, Plaintiff claims that the bulkhead of the cab lacked a warning, that the absence of a warning existed when Wabash manufactured the tractor-trailer, that the lack of warning

_____

[2]A detailed procedural history is found in the Eastern District of Pennsylvania's Memorandum Order, transferring the case from the Eastern District of Pennsylvania to this Court, <u>Durkin v. Paccar, Inc., et al.</u>, No. 09-4892, 2010 WL 176851 (E.D. Pa. Jan. 19, 2010) and in this Court's October 19, 2010 Memorandum Opinion and Order granting Partial Dismissal, <u>Durkin</u>, 2010 WL 4117110.

was the proximate cause of Gangell's death, and that Gangell was a foreseeable user of

the cab.  Wabash moves for Summary Judgment on the grounds that it had no duty to

warn and, in the alternative, that Plaintiff cannot prove causation.  Intertwined with the

summary judgment motion are Wabash's motions to preclude Plaintiff's experts

Rugemer and Vigilante, and Wabash's motion to strike.  Given the relative nature of the

motions, and the potential impact on the universe of considerations before the Court,

Wabash's motion to Strike and to Preclude Plaintiff's Experts will be addressed before

the Court considers whether there is a genuine issue of material fact precluding

summary judgment.

## B. Factual Background[3]

Plaintiff's decedent, Gangell, was employed by R.E. Pierson Construction Co. and

was acting in the course of his employment as a driver on November 12, 2008.  Def.

Facts. ¶4.  The tractor-trailer that Gangell operated that day was one of twenty-four

trailers manufactured by Wabash in 1999 and purchased by Pierson in March 2000.  Id.

at ¶¶ 25, 27.  The tractor trailer weighed 16,730 pounds and the trailer weighed 11,700

pounds, for a total weight of 28,500 pounds. Id. ¶ 29.  The trailer was loaded with eleven

---

[3] The Court commonly turns to the recitation of the undisputed facts to paint the picture of the circumstances and factors considered on summary judgment.  "The purpose behind such a statement is to clarify the issues for the Court, not to increase the burden before it." Globespanvirata v. Texas Instrument, No. 03-2854, 2005 WL 3077915, at *2 (D.N.J. Nov. 15, 2005)."  L.Civ.R. 56.1, Comment 2d.  Review of the "undisputed facts" of this case, as well as a review of the procedural history and letter writing campaign since the inception of this case, reveals only one certainty: everything is disputed. To the extent that Plaintiff's submission in response to Wabash's Statement of Undisputed Facts improperly blurs "the line between fact and opinion," it will be disregarded in accordance with the Court's ruling, *infra*.  Accordingly, the facts as set forth reflect the parties arguments and will be thoroughly addressed in the summary judgment opinion.

50 foot long, coated PZ-35 double sheet pilings, with each piling weighing 6,600 pounds. Id. ¶ 5. The payload of steel sheets had a combined weight of 72,600 pounds. Id. The trailer was equipped with a bulkhead, also manufactured and installed by Wabash. Gangell was delivering the steel to a job site and was traveling through Franklin Township, New Jersey. Compl. ¶ 6. As the vehicle approached the intersection of Coles Mill Road and Wall Street, Gangell applied his brakes in response to a vehicle ahead of him making a left turn. As a result, the steel payload shifted, knocked down the bulkhead, and penetrated the cab of the tractor, pinning Gangell inside. Gangell did not die immediately and was able to communicate with first responders. Unfortunately, Gangell went into cardiac arrest and later died from his injuries sustained in the accident. See, generally, Compl.

The parties have different views on the cause of the accident. Plaintiff faults Defendant for failing to warn Gangell that the steel bulkhead did not offer any protection. Defendant faults Gangell for failing to properly secure the load and for attempting to transport a payload with a weight that violated federal and state regulations. To understand the parties' positions, a discussion on the trailer, the bulkhead, and the various federal and state regulations that governed the transportation of Gangell's trip is necessary.

**A. The Trailer**

Wabash manufactured the trailer that Gangell was hauling. It had twelve side rail sliding winches, which were part of the load securement system. Ex. DD. Sales Documents. In addition, the trailer was equipped with 48 stake pockets and 48 pipe spacers, which can both be used to attach chains or other securement devices. Kemp

Report, Ex. T, at 3.  The trailer was labeled in accordance with 49 C.F.R. §567.4 with a 100,000 pound Gross Vehicle Weight Restriction (GVWR) and a 20,000 pound Gross Axle Weight Restriction (GAWR) for each of two axles.  Id. at 150-21: 5.  In layman's terms, this means that the trailer was capable of hauling a load that weighed up to 100,000 pounds, as long as it was loaded in a manner in which the weight upon each axle did not exceed 20,000 pounds.

### B. The Bulkhead[4]

The trailer was equipped with a bulkhead, which was also manufactured and installed by Wabash.  There is evidence in the record that bulkheads, or front end structures, can be used for reasons other than load securement, such as tarping, storage and windbreak. Kemp Dep., Ex. Z, at 37; Vadnais Report, Ex. BB, at 5.  Bulkheads are also used for protection from shifting loads. Commercial Driver's License ("CDL") Manual, Ex. F at p. 3-58.  When used for protection, the amount of force a bulkhead can withstand depends on the manner in which cargo is loaded, either up against the bulkhead or not in contact with it, and the rating of the bulkhead.  Commonly, bulkheads will have a rating affixed to them that indicates that the Department of Transportation has certified the bulkhead to meet certain strength standards for a static load; which is a load where the cargo is loaded so that it braces the structure.  These bulkheads are called "DOT rated" bulkheads.

The Wabash bulkhead in this case did not have a DOT rating, and therefore, there was no indication on the bulkhead that it was suited to meet a certain strength rating.

---

[4]The term bulkhead refers to a structure that may be found at the front of a flat bed trailer. It is also commonly referred to as a headerboard or headboard.

This does not mean that the Wabash bulkhead did not meet any strength standards or that it could not withstand a certain amount of force. Rather the absence of the rating means only that it was not certified to meet an identifiable strength standard. These bulkheads are referred to as "NON-DOT rated." The difference[5] between DOT rated bulkheads and Non Dot rated bulkheads is described by a manufacturer as follows:

> DOT rated bulkheads have been tested and certified to certain sections of the Federal Department of Transportation Regulations for front-end safety structures and are independently tested to ensure that they meet such standards when properly installed. A DOT rated bulkhead will be clearly marked with a label on the bulkhead itself. Non-DOT rated bulkheads are not guaranteed to meet these standards.

Aero Industries Frequently Asked Questions, Ex. U.

Plaintiff contends that Gangell believed the Wabash bulkhead was DOT rated and offered protection proportionate to the load capacity of the trailer (which was 100,000 pounds) to which it was affixed. Plaintiff acknowledges that bulkheads serve functions, besides protection from a shifting load. However, Plaintiff argues that because this bulkhead was placed on a heavy duty trailer capable of hauling 100,000 pounds of cargo, Gangell reasonably believed that the bulkhead structure offered protection proportionate to the trailer's hauling capacity. According to Plaintiff, the lack of a warning on the subject bulkhead alerting Gangell that the bulkhead offered little

---

[5]Defendant argues that the fact that a bulkhead may be DOT-FMCSA rated does not factor in to the equation and is a red herring. There is much discussion in the record about the existence of Non-DOT rated bulkheads. Some experts on both sides were unaware that they existed. Defendant offers proof of their existence by appending materials from other manufacturers that offer them. See Ex. X, Sturdy-Lite frequently asked questions; Ex. Y, Utility bulkhead options. In addition, Defendant's expert David Kemp, who was at one time employed by Great Dane Trailers and Dorsey Trailers stated that both companies carried Non-DOT rated bulkheads. See Kemp Report, Ex. T. at 5; Kemp Dep., Ex. Z at 29-31, 33-38.

protection — or at least less protection than what Gangell otherwise would expect — was the proximate cause of Gangell's death.

Plaintiff's expert, Dr. William Vigilante, submits a proposed warning:

**WARNING**
- This model Bulkhead is NOT FMCSA-DOT compliant.
- This Bulkhead does NOT provide cab protection or cargo securement.
- This Bulkhead is designed for use with tractors that have integrated cab protection only.
- Always ensure your cab protection is FMCSR-DOT rated.

Plaintiff contends that had Gangell been aware that the bulkhead attached to his trailer, a trailer that had the capacity to hold 100,000 pounds of cargo, would not provide him with any protection in the event of a load shift, Gangell would have endeavored to haul the load differently, perhaps by taking two trips, using a different trailer, or employing additional securement devices.

### C. Applicable Regulations

Defendant contends that Gangell's overloading of the trailer and/or failure to properly secure the load were the proximate cause of his death. There is no dispute that the combined weight of the vehicle and the cargo was roughly 103,000 pounds; 23,000 pounds over a state regulation that precludes travel of a vehicle weighing over 80,000 pounds. N.J.S.A. 39:3-84(b)(2); see also Def. Facts at ¶7. Trooper Pecenak of the New Jersey State Police Investigation Unit estimated that the cargo load weight was roughly 74,5000 pounds. Police Report, Doc. 150-1. Even though the trailer may have had the capacity to haul the load, see Pl.'s Fact Resp., ¶ 5, Pierson was cited for the overloaded tractor-trailer because the combined gross vehicle weight of the tractor, trailer and load exceeded 80,000 pounds. Def. Facts. at 7.

Defendant also cites to the Federal Register Code of Federal Regulations that were in place at the time of the accident and govern load securement requirements.  In the year 2000, The Federal Motor Carrier Safety Act ("FMCSA") proposed new rules, which state on part:

> The current rule emphasizes occupant protection rather than cargo securement.  It is expected that cargo that is not braced against a front-end structure could shift forward, and the structure would prevent the load from penetrating the driver's compartment.  While this concept may have been required for certain types of cargo, the FMSCA believes the best way to ensure driver's safety is to have tougher standards to prevent the cargo from shifting forward.  For example, if the vehicle is transporting metal coils, once the load begins to move forward, it is unlikely that a front-end structure would save the driver.

See Ex. C, 65 Fed. Reg. 79050-55 (Dec. 18, 2000).

This Rule was promulgated in 2002.  In general terms, the new rules require better load securement, most often achieved by increasing the number of tie down devices used and the manner in which the cargo is loaded.  "[B]y establishing new rules to better ensure that [cargo does] not move forward, we are more likely to accomplish the safety objective of saving lives and preventing injuries." 67 Fed. Reg. 61212, 61221 (Sept. 27, 2002), Ex. D.  The new securement rules were available to Pierson, Gangell's employer.

Wabash also cites to rules in effect that speak to the requirements of the front end structure in conjunction with securement when loading and transporting cargo.  Specifically, when a front end structure is used as part of the load securement, i.e. the cargo is in contact with the front end structure of the vehicle, the bulkhead must meet certain performance standards identified in the FMCSA Regulations.  See § 393.114(a)(1) (stating that "a front end structure less than 6 feet in height, a horizontal forward static

load equal to one-half (0.5) of the weight of the articles of cargo being transported on the vehicle.")  There are no regulations that require a bulkhead to be rated if the bulkhead is not being used for purposes of cargo securement.

The requisite number of tie down devices and the method of securement also depends upon whether the bulkhead is used as part of the cargo securement.  For example, FMCSR § 393.110 governs tie downs where "an article is not blocked or positioned to prevent movement in the forward direction by a headerboard, bulkhead, other cargo that is positioned to prevent movement[.]"  This is the scenario here, the cargo was not in contact with the bulkhead at the time of loading, so the bulkhead was not being used as part of the securement system.[6]  In such situations, FMCSR § 393.110 requires  "[t]wo tiedowns if the article is longer than 10 feet (3.04 meters), and one additional tiedown for every 10 feet (3.04 meters) of article length, or fraction thereof, beyond the first 10 feet (3.04 meters) of length" to secure the cargo. FMCSR §393.110(b)(3).

Under the FMCSR regulations applicable in this case, at least seven tie down devices were necessary for cargo securement, given the length of the steel sheets being transported. See FMCSR §393.106(d); New Jersey State Police Driver Examination Report, Doc. 168-8.  Only six were used and there is a factual dispute as to whether all six were in working condition; at least one strap was broken and it cannot be determined if the breakage existed prior to the accident or as a result thereof.  See New Jersey State

---

[6] There is evidence in the record that suggests that one would load the cargo in a manner in which the cargo is not up against the bulkhead in order to comply with GAWR, i.e., to ensure that the axles are not overloaded, or because some loads need to be placed on the trailer from the side. See Ashby Dep. 44; 1-12.

Police Driver Examination Report, Doc. 168-8. Wabash argues that 8 straps should have been used.

Defendant's cite The Driver's Handbook On Cargo Securement as another source of information on securement practices. In a section on warnings that displays the text inside a red box next to art depicting "caution", the Handbook indicates that a front end structure can be used to "provide some restraint against forward movement if the cargo is in contact with it." See WNC1035. Under the heading of "Fundamentals of Cargo Securement," the Handbook warns that an improperly secured load can result in death, loss of the load, damage to the cargo, damage to the vehicle, a crash, issuance of citations and the vehicle being placed out of service. See WNC1028.

Plaintiff heavily relies on a depiction contained in the Commercial Driver's License Manual that is titled "Tie-Down Devices" and shows a flatbed trailer with a front-end structure. The cargo is secured on the trailer in a manner that allows for a gap between the bulkhead and the cargo; stated differently, the cargo and bulkhead are not in contact. On the same page as the depiction is the following statement:

> Front-end headerboards ("headache racks") protect you from your cargo in case of a crash or emergency stop. Make sure the front-end structure is in good condition. The front-end structure should block the forward movement of any cargo you carry.

Ex. B, p. 3-58. Plaintiff argues that this diagram and language alone are sufficient to defeat Wabash's summary judgment and Daubert motions. Plaintiff argues that the depiction in the CDL Manual led Gangell to believe that he could rely on the bulkhead for protection, even if he loaded the trailer without the cargo and bulkhead being in contact. Notably, on the same page is language stating, "There are special requirements

for securing various heavy pieces of metal.  Find out what they are if you are to carry such loads." Id.

Defendant argues that the above regulations and guidelines govern the use of the bulkhead and the expectation of protection provided by the bulkhead when used in accordance with the securement provisions.  Wabash contends that the bulkhead only offers protection when the cargo is in contact with the front end structure of the vehicle and that Gangell could not have relied on it in the present circumstance.  See FMSCR §393.114(a) (stating that the strength requirements for front-end structures apply only to motor vehicle transporting articles that are in contact with the front-end structure) (emphasis added); Larry Minor's 2008 PowerPoint Presentation, Ex. H., Doc. 150-9. Therefore, Defendant argues that the fact that the bulkhead was not rated is immaterial because it was not being used for cargo securement purposes.  Accordingly, the combination of Gangell's failure to properly secure the load, the weight of the steel, and Gangell's disregard for the regulations governing the securement of his cargo were the proximate cause of the accident.

Defendant further argues that it had no duty to warn Gangell that the bulkhead attached to his trailer was Non-DOT rated because Gangell was not using the bulkhead for cargo securement and because there is no evidence that a DOT rated bulkhead would have stopped the accident in this case.  In fact, Defendant claims that Plaintiff abandoned her design defect claim because her expert was unable to design an alternative bulkhead that would have with stood the forces at play in the accident under identical circumstances.  For these reasons, Defendant argues that the negligent and non- compliant manner of load securement coupled with the weight and overloaded

cargo- and not the failure of the bulkhead- were the cause of the accident.   At the heart of her opposition to Defendant's motions to Preclude Experts Rugemer and Vigilante and for Summary Judgment, is Plaintiff's reliance on the above referenced diagram of a loaded tractor trailer depicted in the Commercial Driver's License Manual.  Plaintiff again forcefully relied on the depiction as convincing during her oral opposition to the pending motions at the hearings on February 20, 2013 and March 12, 2013.  The issues at hand are whether Wabash had a duty to warn Gangell that the bulkhead placed on its trailer did not offer the expected protection, and if so, whether that failure to warn was the proximate cause of Gangell's death.  The Court will consider the arguments.

## II. WABASH'S MOTION TO STRIKE

Defendant moves to strike Plaintiff's response to its L. Civ. R.  56.1 statement of undisputed facts because it is laced with legal argument and conclusions.  To the extent that these admissions endeavor to argue the relevancy of the facts, the R. 56.1 statement fails to advance the underlying purpose of L. Civ. R. 56.1 of narrowing the issues before the Court.[7]  See Sprint Spectrum v. Paramus Zoning Bd., No. 09-4940, 2010 WL 4868218 (D.N.J. Nov. 22, 2010).

"The purpose behind [the L. Civ. R.  56.1] statement is to clarify the issues for the Court, not to increase the burden before it." Globespanvirata v. Texas Instrument, No. 03-2854, 2005 WL 3077915, at *2 (D.N.J. Nov. 15, 2005)."  L.Civ.R. 56.1, Comment 2d. The Court will accept the facts that are admitted in the following paragraphs: 1, 3, 4 , 5, 6, 7, 12, 13, 14, 18, 20, 21, 22, 23, 25, 27, 28, 29, 36, 37, 38, 39, 40, 41, 42, 43, 45, 46, 47,

---

[7] The Court struck Plaintiff's first response to the L. Civ. R. 56.1 statement for being over length and burdensome on August 15, 2012. See Dkt. No. 164.

48, 49, 50, 51, 54, 56, 58, 59, 60, 61, 64.  The Rule 56.1 statement should only identify the universe of uncontested facts before the Court; arguments as to the force of those facts belongs in the brief.   Plaintiff's  Rule 56.1 statement in this case is burdensome on the Court.  It  contains unnecessarily long expositions of the relevancy of the facts of this case, with the response to Paragraph 9 running over six pages and the response to Paragraph 17 running over 8 pages.  The Court will not go through the responses line by line to determine in each instance where Plaintiff "blurs the line between fact and opinion." N.J. Auto Ins. Plan v. Sciarra, 103 F. Supp. 2d 388, 395 n.4 (D.N.J. 1998).  Much of Plaintiff's submission is highly improper under the Local Rules and will be disregarded.  To the extent a fact is admitted or denied, the Court will accept the submission.  Any argument related to the legal relevancy of that fact will be disregarded.

### III. WABASH'S MOTION TO PRECLUDE PLAINTIFF'S EXPERTS' TESTIMONY

Wabash moves to strike Plaintiff's experts William Vigilante ("Vigilante") and Brooks Rugemer ("Rugemer") pursuant to Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and Fed. R. Evid. 702.  Plaintiff offers Vigilante as a "warnings" or "human factors" expert.  Vigilante crafted a proposed warning that Plaintiff believes, if available to the decedent, would have alerted decedent to the reality that the tractor-trailer bulkhead was not FMCSR-DOT rated and that the bulkhead did not provide protection.  Plaintiff avers that this warning would have altered decedent's conduct on the day of the accident.

Rugemer is offered as a "Commercial Trucking Specialist."  Rugemer states that he is "an expert in the typical actions that a CDL driver performs in the course of doing

his job.  That's both driving and non-driving activities." Rugemer Dep., Ex. C, at 31.

Plaintiff offers Rugemer to explain what the reasonable truck driver would expect when

confronted with the bulkhead placed on the subject trailer and how that reasonable

truck driver would expect the equipment to perform.

Wabash moves to preclude both experts based on qualifications, reliability and

fit.  In addition, Wabash argues that portions of the expert testimony go to the ultimate

and/or should be deemed inadmissible pursuant to Fed. R. Evid. 403.

### A. Federal Rule of Evidence 702 and <u>Daubert</u>

The guiding principles that inform the Court's judgment are found in Federal

Rule of Evidence 702 and <u>Daubert</u>, 509 U.S. 579.  Federal Rule of Evidence 702

provides:

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or education,
> may testify thereto in the form of an opinion or otherwise, if (1) the testimony
> is based upon sufficient facts or data, (2) the testimony is the product of
> reliable principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Consistent with that Rule, <u>Daubert</u> established a "trilogy of

restrictions" on the admissibility of expert testimony relating to scientific knowledge.

See <u>Calhoun v. Yamaha Motor Corp.</u>, 350 F.3d 316, 321 (3d Cir. 2003).[8]  This "trilogy"

consists of "qualification, reliability and fit."  <u>Id.</u>  The Third Circuit liberally construes

the qualifications of an expert, noting that "a broad range of knowledge, skills, and

---

[8] <u>Daubert</u> also applies to expert testimony relating to "technical or other specialized
knowledge."  <u>See</u> <u>Oddi v. Ford Motor Corp.</u>, 234 F.3d 136, 146 (3d Cir. 2000) (quoting <u>Kumho
Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

training will qualify a witness as an expert . . ." See Yarchak v. Trek Bicycle Corp., 208 F. Supp. 2d 470, 495 (D.N.J. 2002) (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994) ("Paoli II")) (internal quotations omitted).  As such, exclusion of an expert witness is "improper simply because an expert does not have the most appropriate degree of training." Yarchak, 208 F. Supp. 2d at 495 (quoting Diaz v. Johnson Matthey, Inc., 893 F. Supp. 358, 372 (D.N.J. 1995)).

    With respect to reliability, the focus is on the "principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595.  Four benchmarks help determine whether a theory or technique qualifies as "scientific knowledge" such that it will assist the trier of fact.  See Daubert, 509 U.S. at 593.  The Court considers: (1) whether the theory can be or has been tested; (2) whether the theory or technique has been subjected to peer review and/or publication; (3) the rate of error; and (4) whether the theory or technique has been generally accepted within the putative expert's respective community.  Id. at 593-94.  The Third Circuit adds other factors, including: (5) the existence and maintenance of standards controlling the technique's operation; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.  Paoli II, 35 F.3d at 742 n. 8. When considering these factors, the Court's inquiry must be a "flexible one." Id.

    As for the third prong, Rule 702 requires that the "proffered expert testimony must 'fit' within the facts of the case." Yarchak, at 208 F. Supp. 2d at 496.  The fit requirement mandates that the testimony "in fact assist the jury, by providing it with relevant information, necessary for a reasoned decision of the case." Id. (citing

Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 595 (D.N.J. 2002)).  Thus, even if an expert is qualified and relies on sound methodology, he must still "apply this expertise to the matter at hand."  See Calhoun, 350 F.3d at 324.

These factors are not exclusive.  They "are intended to serve only as 'useful guideposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted.' " Yarchak, 208 F. Supp. 2d at 495 (quoting Heller v. Shaw Industries, Inc., 167 F.3d 146, 152 (3d Cir. 1999)).  With the help of these guideposts, the Court performs its essential gatekeeper role under Federal Rules of Evidence 702.

**B. Daubert Hearing**

Rule 104(a) permits a preliminary inquiry in the form of a Daubert hearing, wherein the burden of proof on admissibility of an expert is set at a preponderance of the evidence.  See Fed. R. Evid. 104(a);  Daubert, 509 U.S. at 592 n.10 (referring to Rule 104(a) and holding that such preliminary "matters should be established by a preponderance of proof.").  The Third Circuit stresses "the importance of in limine hearings under Rule 104(a) in making the reliability determination required under Rule 702 and Daubert."  See In re TMI Litigation, 199 F.3d 158, 159 (3d Cir. 2000) (quoting Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 417 (3d Cir. 1999)).  The importance of such a hearing is heightened when either party advances a Daubert challenge "in the context of a summary judgment motion or where summary judgment will inevitably be granted if the proffered evidence is excluded."  In re TMI Litigation, 199 F.3d at 159.  Fully aware that a "failure to hold [an in limine] hearing" in this context "may be an abuse of discretion", see id. (quoting Padillas, 186 F.3d at 418), this Court set aside three days for the above-mentioned Daubert challenges by way of Letter Order.  (Letter Order [Dkt.

Entry No. 57], <u>filed</u> Feb. 18, 2009.)

### C. Analysis

In order to put its arguments into context, Wabash argues that the transition towards better load securement to prevent load shifting, and away from reliance on front end structures for protection, that occurred in the trucking industry in response to growing safety concerns, must be considered against the facts of this case.[9]  The Court agrees that any information relevant to the industry would be appropriately considered as the backdrop against which the testimony of the experts is measured under the auspices of <u>Daubert</u>.

### 1. Brooks Rugemer

Wabash moves to preclude the testimony of Brooks Rugemer based on lack of qualification, reliability, and because the testimony he offers does not fit the particular facts of this case.  Boiled down, Defendant's arguments essentially attack three opinions offered by Rugemer.

> 1. The lack of any warnings, labels, diagrams, placards, or other language or graphical depiction on the subject bulkhead caused Mr. Gangell (and R.E. Pierson) to reasonably believe that it was a DOT rated front end structure.
>
> 2. The lack of any warnings, labels, diagrams, placards, or other language or graphical depiction on the subject bulkhead caused Mr. Gangell (and R.E. Pierson) to reasonably believe that it was designed and manufactured in a manner which it would protect drivers from shifting loads provided

---

[9] The Court has reviewed two Federal Register Notices dated December 18, 2000 and September 27, 2002.  Read together, these Notices detail the history of the apparent shift towards regulations with the objective of protecting against shifting cargo.  The focus transitions away from the regulation of front end structures towards the advancement of better load securement measures.  The general thought is that safety is better achieved by preventing the load from moving; once it begins to move, the front end structure is not as effective.

the load was within the trailer's GVWR.

3. The lack of any warnings, labels, diagrams, placards, or other language or graphical depiction on the subject bulkhead caused Mr. Gangell (and R.E. Pierson) to reasonably believe that no additional front end structures were needed in order to safely transport a load on the trailer, and thus resulted in Mr. Gangell using a tractor that was not equipped with a cab shield or headache rack.

Rugemer Report, August 25, 2011, p. 6.

### a. Qualifications

Mr. Rugemer is qualified to testify as an expert in this case.  Although Defendant's arguments against Mr. Rugemer have force, Mr. Rugemer is a commercial trucking specialist who has practical experience as a CDL truck driver, with 1.5 million miles logged, and extensive experience as trainer, safety director, and manager of trucking fleets. Pl. Opp. To Preclude Rugemer, Ex. A, Rugemer Curriculum Vitae; Ex. C, Rugemer Report, pp.1-2.  As such, he has knowledge that is superior to the average layman in regards to trucking practices.

Defendant's chief criticism of Mr. Rugemer focuses on his lack of experience with flat-bed tractor trailers equipped with bulkheads.  Although he holds a Commercial Driver's License, Mr. Rugemer has never operated a flatbed tractor trailer with bulkhead. Rugemer Dep., p. 174; 15-20.  He also has limited experience in managing trucking fleets with trailers equipped with bulkheads. Id. at pp. 174; 25-175;9.

Q. Now you have three or four months experience operating flatbed trailers, correct?

A. Yes.

Q. But those flatbed trailers had no bulkheads on them?

A. That's correct.

Q. So you didn't get any experience from that with regard to bulkheads, right?

A. Correct.

Q. So your one set of experience with regard to bulkheads is being involved in the purchase of trailers with rated bulkheads when you were with Hahn, correct?

A. And the training of drivers to use those new trailers within the scope of our new contract.

Q. But that's it, correct?

A. That's it, yes.

Rugemer Dep. at 174:15-175:9.

In 2000-2001, Rugemer was the Safety and Training Manager for Hahn Transportation.  Id. In that capacity, he oversaw a fleet of 200 trailers with 15 being flatbeds.  Mr. Rugemer could not say whether all of the bulkheads on those 15 vehicles were rated.  Moreover, he was involved in the purchase 12 or 13 more trailers with bulkheads that were ultimately acquired after he left the company.  The purchase of those new trailers included bulkheads that did not meet the FMSCR ratio of one-half of the weight of the articles of cargo being transported on the vehicle, see § 393.114(a)(1); one trailer had a GWVR of 109,000 pounds and the bulkhead for that trailer was rated at 40,000 pounds.  Finally, Mr. Rugemer was not aware of the existence of non-rated DOT bulkheads.  Id. at 174;3-13.

Mr. Rugemer's lack of experience with flat bed trailers and bulkheads certainly raises the question of his qualifications for this case.  But on this limited and liberal review, the Court cannot say that Mr. Rugemer lacks the qualifications to testify in this case.  Yarchak, 208 F. Supp. 2d at 495 (it is improper to strike an expert simply because

the expert does not have the most appropriate degree of training.)  While thin at the micro-level, Rugemer's general experience in the trucking industry, particularly with safety standards and driving, qualify him to testify as an expert in this case.  Defendant's well thought out arguments are more appropriately made during cross-examination.

> [C]ourts allow the thinness and other vulnerabilities in an expert's background to be explored in cross-examination and avoid using such weaknesses as a reason to exclude a party's choice of expert witness to advance a claim or defense. That the strength of an individual's qualifications may be undermined through cross-examination is not a sound basis for precluding an expert from testifying as part of a defendant's defense, even if it likely will affect the weight that the jury will give the opinion. Rather, a court should simply be satisfied that the expert has a basis in knowledge, skill, education, training, or experience to be able to form an opinion that can aid the jury on a subject that is beyond its ken.

State v. Jenewicz, 193 N.J. 440, 445 (2008) (citing State v. Kelly, 97 N.J. at 208 (1984)).

Third Circuit precedent directs that the qualification requirement be interpreted liberally, and that "a broad range of knowledge, skills, and training qualify an expert as such."  Calhoun, 350 F.3d at 321 (3d Cir. 2003) (citing Paoli II, 35 F.3d at 741 (3d Cir. 1994)); Thomas & Betts Corp. v. Richards Mfg. Co., 342 Fed. Appx. 754, 760–61 (3d Cir. 2009).  Under the liberal standards of Fed. R. Evid 702, Plaintiff has met her burden of proving that Mr. Rugemer is qualified to testify in this case. See Habecker v. Copperloy Corp., 893 F.2d 49, 52 (3d Cir. 1990) (citing Knight v. Otis Elevator Co., 596 F.2d 84 (3d Cir. 1979) (holding that the proposed expert should have been allowed to testify because his inexperience in the areas of design and manufacturing should go to the weight, not the admissibility, of his opinion).

### b. Reliability

Mr. Rugemer's review of the documents and testimony in this case satisfies the

reliability test under Daubert.  Mr. Rugemer reviewed the pleadings, deposition
testimony, Dr. Vigilante's expert report, the FMCSR safety regulations and Commercial
Driver's License Manual, among other items.  Rugemer Report, Ex. C at p.2.  He also
reviewed Defendant's expert's reports and issued, *inter alia*, a critique of  Mr. Kemp's
expert opinion. Rugemer Letter, Ex. D. In addition, Mr. Rugemer conducted a review of
exemplar bulkheads and explained the difficulty in discerning a visual distinction
between Non Rated and Rated bulkheads.  Rugemer Letter Ex. D, p. 5

 Because Mr. Rugemer's testimony is not science based, evaluation of reliability
turns on more human factors.  "In cases not involving scientific testimony, courts must
still serve the gatekeeping function described in Daubert . . .  but the factors identified in
Daubert may or may not be pertinent in assessing reliability, depending on the nature of
the issue, the expert's particular expertise, and the subject of his testimony. " United
States v. Walker, 657 F.3d 160, 175 (3d Cir. 2011) (citing Betterbox Commc'ns Ltd. v. BB
Techs., Inc., 300 F.3d 325, 329 (3d Cir. 2002) (internal quotations omitted) (citations
omitted)). The Court has "considerable leeway in deciding in a particular case how to go
about determining whether particular expert testimony is reliable." Kumho Tire, 526
U.S. at 152, 119 S.Ct. at 1176; Viking Yacht Co. v. Composites One LLC, 613 F.Supp.2d
626, 634 (D.N.J. 2009).  Here "the relevant reliability concerns may focus upon
personal knowledge or experience." Betterbox Commc'ns Ltd., 300 F.3d at 329 (quoting
Kumho Tire, 526 U.S. at 150, 119 S.Ct. 1167) (internal quotations omitted).

 Mr. Rugemer's reliance on the deposition testimony and, *inter alia*, the relevant
safety regulations and manual is sufficient methodology.

 Defendant's arguments appear to challenge the weight and fit of Rugemer's

reliance on certain materials rather than demonstrate that the methodology in formulating those opinions is unreliable.

The voluminous record in this case demonstrates that the awareness of non-DOT Rated bulkheads may not be commonly known in the industry. Defendant's expert Ronald Ashby testified in his deposition that he only became aware of the existence of bulkheads that did not have a rating on them through his involvement in this case.[10] Ashby Dep., 57; 7-12. And Pierson employees Nelson and Donahue indicated that they were not aware of the difference between DOT and Non DOT bulkheads. There is also a dispute about the relevancy of DOT versus Non DOT rated bulkheads and whether the existence of Non DOT rated bulkheads is commonly known in the industry. Rugemer's assessment of what is commonly known in the industry is therefore relevant. The manner in which he goes about making that assessment is certainly subject to cross examination, but passes muster under Daubert.

**c. Fit**

The Court finds that Mr. Rugemer's opinions sufficiently fit the facts of this case. Defendant's attack on the fit of the opinions is its most persuasive challenge to Mr. Rugemer and the Court agrees that Rugemer's fit is somewhat problematic. However,

---

[10]Mr. Ashby was presented as an expert in regulatory matters to identify the regulations that Gangell and Pierson violated on the day of the accident. Ashby Dep., Doc. 172-7, Ex. E, 57-59; Ashby Report, Doc. 150-67; Ashby Supp. Report, Doc. 150-47. He was not offered as an expert on industry knowledge of bulkheads. Ashby opined on the regulation of bulkheads when used as part of the cargo securement system. In this regard, it was his opinion that the rating, or lack thereof, in this case was insignificant because the bulkhead was not being used to secure the load. Ashby Dep., 172-7 at 38-39. Ashby does not have a CDL and was only aware about bulkheads from the Federal Motor Carrier Safety Regulations. Id. at 156, 105-07, 147-49. Thus, his unawareness may not translate into the industry's unawareness.

by the slimmest of margins Rugemer's opinions sufficiently "flow from the facts known to the expert and the methodology used." Oddi, 234 F.3d at 145 (citing Heller v. Shaw Industries, Inc., 167 F.3d 146, 153 (3d Cir. 1999)).

Rugemer defined the scope of his opinion as to "what the typical driver would think and believe reasonably faced with these conditions and this scenario." Rugemer Dep., 198;15-24. Indeed, Rugemer admitted that he is not a human factors expert, a design expert, or a warnings expert. Id. at 163;16, 164;7. The basis for his opinions in this case come, from among other things, his experience as a CDL driver and safety trainer. Id. at 42;19-25. When Rugemer was asked what basis he had for his opinion that Gangell would have expected that the bulkhead attached to the trailer would have had the capacity rating required for a load within the trailer's GVWR, Rugemer, who has never operated a flatbed trailer stated: "I don't have any information that speaks to that specifically. I don't have any information that his company or anyone told him what he could and could not haul with that trailer." Id. at 111;5-15. Likewise, Rugemer could not offer proof that Gangell relied on the depiction in the CDL Driver's Manual or evidence that Gangell was even aware of the trailer's GVWR capacity. Id.

Rugemer testified that in his experience, drivers are overly cautious in load securement, often going over and above the requirements, even when using a rated bulkhead, but agreed that Gangell did not do the minimum required here. Rugemer Dep., Doc. 152-6 at 211, 137. Rugemer agreed with Defendant that bulkheads do not offer unlimited protection and that a driver could not rely on an unmarked bulkhead to have a specific rating. Id. at 79, 124. Importantly, Rugemer stated that a driver should not use a bulkhead as part of the load securement system if that driver was unable to

discern the rating of the structure.

> A. The driver has the responsibility to ensure that the load is secure.  He does not have to do the actual securement.

> Q. Okay. And in securing the load, does the driver have to make sure that the cargo is secured using devices that have an appropriate rating?

> A. Yes.

> Q. Can a bulkhead be a securement device?

> A. It can, yes.

> Q. So if the driver is using the bulkhead as a securement device, does the driver have a responsibility to know what the rating is for that bulkhead?

> A. If that information is available, yes.

> Q. If the information isn't available and he doesn't know what the rating is for the bulkhead, can he use the bulkhead as a securement device?

> A. He shouldn't, no.

Rugemer Dep. 78:7- 79:9.

Rugemer states he considered the testimony of Robert Donahue and Kary Nelson, who although were both unaware of the difference between DOT and Non DOT bulkheads, agreed that the bulkhead here was not being used as part of the securement system (which would implicate the rating).  Nelson testified that the cargo in this case could not have been placed up against the bulkhead because of the method by which the crane loaded the sheets onto the trailer.  Nelson Dep., 23:16-24:25.  Because a shoe was necessary to perfect loading, a resulting four inch gap between the cargo and the bulkhead was the norm. Id. Robert Donahue testified similarly, stating that the cargo was usually not loaded up against the bulkhead, because of the manner of loading and because of axle ratings. Donahue Dep. 32:24-33:18.

The most troubling aspect of Rugemer's opinion is that it was formed without an

awareness of a shift toward better load securement and away from the use of bulkheads

for safety in the FMCSA Regulations.

> ... we continue to believe the best way to ensure driver safety is to have
> tougher standards to prevent the cargo from shifting forward.  For
> example, if the vehicle is transporting metal coils, once the load begins to
> move forward, it is unlikely that a front-end structure would save the
> driver.  However, by establishing new rules, to better ensure that the coils
> do not move forward, we are more likely to accomplish the safety objective
> of saving lives and preventing injuries.

Federal Register Notice/ Vol. 67, No. 188,/ Friday, September 27, 2002/ Rules and

Regulations.

Mr. Rugemer attempted to explain why he was unaware of the shift.

> **[Mr. Rugemer]**: I would like to make a comment about this Exhibit 139,
> it's dated September 27, 2002, on Page 61212, the next-to-last paragraph,
> first column states: "This rule was effective December 26, 2002, motor
> carriers must ensure compliance with the final rule by January 1, 2004."
>       And my reason for bringing that up is there are always updates and
> white papers and such information coming from the Federal Motor Carrier
> Administration.  The fact that it's dated September 27, 2002, was when
> this was – this publication was put into record I believe, so there is – you
> have a couple more months before it comes into effect and then you have
> two years before it becomes the law of the land.  And the reason for that, it
> takes a while to disseminate this out to the industry so that they can set up
> their new programs, they can do what they need to do to make their fleets
> and their operations compliant.
>       So I left Hahn in late 2002.  Did I know this came out? No, I did not
> know this came out in 2002.

> **Mr. Dietrich**: Okay.  And after you left Hahn, you weren't really involved
> with flatbed trailers again?

> A. Almost all trucking has some manner of load securement training to it,
> so I would have been involved in whatever load securement training
> applicable at the time.

> Q. But you weren't involved with flatbed trailers anymore after leaving
> Hahn?

A. That's correct, yes, sir.

Rugemer Dep. at 121:21-123:11.

Even though Mr. Rugemer has extensive experience in the trucking industry, his minimal involvement with flatbed trailers and his lack of awareness of the shift away from bulkhead protection are problematic in supporting his opinion.  Nonetheless, Rugemer is qualified to opine as to what a CDL Driver would routinely rely on when making a decision on equipment, equipment performance, and securement.  Given the fact that there is a debate about the awareness of non-DOT rated bulkheads, Rugemer's conclusion that because Gangell used the trailer before without incident and because the presence of the bulkhead may have provided Gangell with some additional assurance of protection, Gangell likely believed, as the reasonable truck driver, that the bulkhead offered proportional protection to the trailer to which it was affixed and this fact informed his actions on the day of the accident is tenuous, but sufficiently flows from the facts of this case.  The danger of the unknown strength of the bulkhead may have informed Gangell's actions.  The Court need not weigh the correctness of Rugemer's conclusion, only that it flow from the facts and considerations and is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." United States v. Schiff, 602 F.3d 152, 173 (3d Cir. 2010) (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985) (internal quotations omitted)).  Because Rugemer can opine as to the considerations a CDL driver makes when visually accessing equipment and safety, his opinions are relevant and will aid the jury.[11]

---

[11] Rugemer's answer to defense counsel's question as to what Gangell would have done differently if he knew the bulkhead was not-rated may come in. Although it was not offered in

### 2. William Vigilante

Defendant challenges both the opinions offered by Dr. Vigilante as well as the proposed warning that he crafted.

## a. Qualifications

Vigilante possesses the qualifications necessary to testify as a human factors expert.  Defendant does not object to Vigilante's credentials in that respect; Defendant's attack Vigilante's qualifications because his background lacks expertise in trucking.  Indeed, Vigilante admits a lack of specialized trucking knowledge:

> I am not a trucking procedures guy.  I'm not going to give opinions as to whether or not [Gangell] should have or shouldn't have done that and whether he was or was not in violation. Vigilante Dep., Ex. D, at 266.
>
> *   *   *
>
> Gentlemen, I am not a trucking operations expert, I really don't know.  The permit process sounds familiar.  If its 80,000 pounds, 100,000 pounds, I don't know.  I'd ask Brooks Rugemer. Id. at 267.
>
> *   *   *
>
> Yeah, my understanding is that the cargo securement is based upon the weight and the size of the load.  But for specifics and details, I refer–or defer to Brooks Rugemer. Id. at 177-78.

Vigilante's lack of knowledge of trucking specifics is not fatal under the liberal review the Court must employ at this stage of the litigation.  While this certainly exposes Dr. Vigilante to cross-examination, the insistence on "a certain kind of degree or background is inconsistent with [Third Circuit] jurisprudence in this area.  The language of Rule 702 and the accompanying advisory committee notes make clear that various kinds of 'knowledge, skill, experience, training, or education,' Fed.R.Evid. 702, qualify

---

the official opinion, Defendant's attempt to exclude it pursuant to Fed. R. Civ. P. 26 (a)(2)(B) is denied because it came in response to its question.

an expert as such." In re Paoli, 916 F.3d at 855.  Vigilante's curriculum vitae demonstrates that he possesses the qualifications to testify as a human factors expert. See, Jenks v. N.H. Motor Speedway, CV No. 09-205, 2012 WL 40579 (D.N.H. Feb. 8, 2012) (permitting Vigilante to testify in a golf cart case even though his credentials were not a perfect fit).

### b. Reliability

Unlike Rugemer, Vigilante's discipline falls more neatly in to the scientific methodology rubric identified in Paoli II, 35 F.3d at 742, set forth supra.

Defendant launches a very detailed and persuasive attack on the methodology Vigilante employed in this case. Defendant claims that Dr. Vigilante failed to employ the scientific method to his research, relying only on review of the filings in this case and selective witness testimony.  See Def. Power Point. Presentation, at 5.  In addition, Defendant's claim that Vigilante misrepresented the content of certain reference materials and misapplied the relevant literature to the facts of this case.  Id. at 14.  Such allegations can provide a basis for excluding expert testimony.

For example, a district court struck the human factors expert in a design defect case where the expert's methodology was speculative.  Mause v. Global Household Brands, Inc., No. CIV. 01-4313, 2003 WL 22416000, *4-6, (E.D.Pa. Oct. 20, 2003).  In Mause, the court concluded that a professor of genetics failed to adequately discuss his methodology in his report or deposition. Id.  "In coming to his conclusion that the X–14 caused the plaintiff's injuries, he reveals only that he relied upon his training, education, experience, and materials provided by plaintiffs' counsel, including medical reports about the plaintiff and scientific literature."  Id.  The court found the opinion unreliable

because the expert "only refers to the plaintiff's medical history and the reports prepared by the defendants regarding the X–14. He cites to no specific articles, textbooks, or studies to support his conclusions, nor does he set forth a scientific methodology." Id.

The Mause court identified a second reliability problem, centering on the disconnect between the research the expert relied on and its application to the facts of the case.

> Another reliability issue centers on Dr. Cunitz's reliance on other products' MSDSs. His report lists these MSDSs as a basis for his conclusions. However, Dr. Cunitz admitted in his deposition that MSDSs are used more in workplace settings than for home use. Id. at 54. He also admitted that he surveyed only the MSDSs of certain products and not those products' labels. Id. at 162. He is not aware of any similar products that reproduce the MSDS on its product label. Id. at 163. Dr. Cunitz offers no evidence that the comparison of other products' MSDSs to the X–14's label is a reliable methodology used in his field. His conclusions, being based on unreliable methods, must be excluded under Daubert. See, e.g., Allen v. IBM, 1997 U.S. Dist. LEXIS 8016, at *133 (D.Del. 1997), aff'd, 1999 U.S.App. LEXIS 3286 (3d Cir. 1999) (excluding Dr. Cunitz's testimony because it had no basis in fact); Tyler v. Sterling Drug, 19 F.Supp.2d 1239, 1244 (N.D.Okla.1998) (excluding Dr. Cunitz's testimony because he relied on the general theory of informed consent rather than "qualified scientific methods" or "reliable data"); Walker v. Yellow Freight Sys., 1999 U.S. Dist. LEXIS 16128, at *24 (E.D.La. 1999) (excluding Dr. Cunitz's testimony because he based his opinion on deposition testimony and general theories rather than appropriate industry standards).

Id.

Other courts are likewise skeptical when the cited references are not germane to the issue at hand. See, e.g., Snoznik v. Jeld-Wen, Inc., No. CIV. 09-42, 2010 WL 1924483, * 19 (W.D.N.C. May 12, 2010) (noting the lack of empirical studies on the issue).  Dr. Vigilante was excluded as an expert on that basis in Wald v. Costco Wholesale Corp., 2005 WL 425864, *6 (S.D.N.Y. 2005).

In Wald, Dr. Vigilante was offered as a human factors expert and offered

testimony on the impact of a proposed warning on the packaging of a bicycle helmet.

Even though the Wald court acknowledged Dr. Vigilante's qualifications as a human

factors expert, it found that his proposed testimony would not aid a jury.

> Dr. Vigilante's testimony and report are excluded. While Dr. Vigilante apparently has devoted many years of his life to studying the effects warning labels have on consumers, in the final analysis his testimony would not be helpful to the jury. Questions as to whether the helmet's packaging sufficiently warned Dr. Wald that he would not be protected from injuries such as DAI are to be answered from the perspective of whether a reasonable person would consider himself adequately warned, not whether people in fact pay attention to such warnings. Because this is a normative question, not an empirical one, a lay juror is as qualified to address this issue as any expert. Cf. Voilas v. GMC, 73 F.Supp.2d 452, 464 (D.N.J. 1999).

Id. at *5.

The Wald court was also concerned with the acceptable scientific evidence relied

upon by Dr. Vigilante in formulating his opinion.

> Even were the Court inclined to accept scientific evidence on this matter, Dr. Vigilante has cited no empirical studies that are sufficiently specific to the facts at hand to be helpful. His generalized opinions, for example that consumers tend to rely on information conveyed on labels, are little more than common sense. His application of those theories to this case seems more impressionistic, subjective and conclusory than scientific. Moreover, the Court is skeptical of the reliability of Dr. Vigilante's discipline as applied to a specific case, and it therefore does not matter whether his methodology is accepted within the relevant scientific community, etc. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (stating that presence of Daubert factors is meaningless "where the discipline itself lacks reliability"). At best, his opinions would be irrelevant and unhelpful; at worst, they would confuse and prejudice the jury from forming its own opinions.

Id.

The Court shares this concern and recognizes that "the application of human

factors principles can be highly subjective and thus conveniently malleable. Human

factors testimony which is proffered without a showing of objective support (testing or,

at least, independent support in relevant literature) invites close scrutiny to determine whether the expert's work is an exercise in facile advocacy (e.g. the "ipse dixit of the expert")."  <u>Graves v. Mazda Motor Corp.</u>, 675 F.Supp. 2d 1082, 1102 (W.D. Okla. 2009).

The Court has considered Defendant's arguments and finds that Dr. Vigilante's methodology is reliable.[12]  Here, Dr. Vigilante cites to numerous references in his Report, although only four of those references speak to issues outside the field of human factors. Vigilante Aff., Doc. 154-4, at 20.  Of the four references, two relate to warning design and one is a standard addressing ladders, which Vigilante testified was mistakenly included. <u>Id.</u>, Doc. 154-4, at 12.  Defendant's criticism of Dr. Vigilante's use of the Alexander & Lunenfeld reference is compelling, but mischaracterizes the nature of the reliance.  Either way it does not render the opinion inadmissible.  Rather, the focus is on the "expert's methodology, as opposed to his conclusions, which 'remains the central focus of a Daubert inquiry.'" <u>Ruiz–Troche</u>, 161 F.3d at 81.

In addition, Dr. Vigilante's assessment process followed the scientific method:

> a. Forming an hypothesis which I framed as the purposes of my investigation in my August 23, 2011 report;
> b. Identified relevant scientific and professional principles, theories, and methods.
> c. Collected data relevant to the hypotheses;
> d. Analyzed the data with respect to relevant scientific and professional principles, theories, and methods
> e. Came to conclusions based upon the results of my analyses.  My conclusions were provided as opinions in my August 23, 2011 report as well as my November 22, 2011 supplemental report and were to a reasonable degree of scientific certainty.

---

[12]Dr. Vigilante details his methodology in his expert report and for a second time in the Affidavit submitted in response to the Court's directive in the February 20, 2013 telephone conference. <u>See</u> Dkt. No. 208.

<u>Id.</u> at ¶ 9.

Defendant's challenges to the opinions offered center not on the fact that these steps were taken by Dr. Vigilante, but rather on the credibility of the references and the weight Dr. Vigilante attributed to them in formulating his opinion.[13]   Such an attack is for cross-examination.  <u>Daubert</u>, 509 U.S. at 596. Dr. Vigilante's method of gathering information is reliable in this case.

The Court also finds that Dr. Vigilante employed an acceptable methodology in formulating his proposed warning in this case. Defendant's claim that the warning fails to identify the hazard as being a load shift appears to be a mischaracterization of Plaintiff's theory in this case.[14]   Throughout this litigation, Plaintiff claims that the hazard is the lack of warning that the bulkhead may not provide proportional protection for the trailer to which it is attached.  This theory may not carry the day, but that is not

---

[13]However, there are legitimate concerns related to some of Dr. Vigilante's sources, including his own father and two coworkers. For example, Dr. Vigilante stated that he consulted experts in the field, including Rugemer, Doug Rowland, and Lance Watt.  All three men work with Vigilante at Robson Forensics and his father is not a named witness and may be biased.  As one court noted "[f]or purposes of a <u>Daubert</u> inquiry, however, the relevant peer group cannot be a member of vigilante's own workplace." <u>Jenks</u>, Civ. No. 09-205, 2012 WL 405479, * 4.  It is likely that these experts share an interest in Vigilante's opinions being accepted, which undermines the value of these sources.

Nonetheless, Vigilante considered an array of deponents, including, *inter alia*, Waldon White and Terrance Boyle, neither of whom knew the difference between Non Rated and Rated bulkheads.  And there is testimony in the record from Trooper Pecenak regarding the bulkhead and Ronald Ashby, who stated that you may have "an assumption that [the bulkhead] met the requirements for the load it was transporting" upon visual inspection. Ashby Dep., Ex. CCC at 56-57. Dr. Vigilante's consideration of these sources is reliable in this case.

[14]Vigilante identified the hazard as the reasonable expectancy that the bulkhead would provide cab protection from a frontal load shift.  In his deposition, however, he stated that the danger in this case is the shifting load. Vigilante Dep., 251:1- 252:2.

relevant at this stage. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596; see also Fed.R.Evid. 702 advisory committee note (2000) ("the rejection of expert testimony [on the basis of unreliability] is the exception rather than the rule").

Further Defendant's claim that the warning violates ANSI Z535.4, because it fails to provide the means of avoiding the hazard is forceful, but does not render the warning inadmissible.[15]  In addition, Dr. Vigilante was not required to compare the language of his proposed warning to those provided by other manufacturers in order to render a reliable opinion. See, e.g., Pineda v. Ford Motor Co., 520 F.3d 237, 248–49 (3rd Cir. 2008) (expert "did not have to compare the language of [the warnings on the defendant's product] with the language provided by other manufacturers in order to render a reliable opinion that [the defendant's product] failed to provide adequate instructions or warnings").

Given that Plaintiff identifies the hazard to be warned against as the undeterminable rating of the bulkhead and therefore appropriate usage of the bulkhead, Dr. Vigilante's warning addresses that concern and is developed consistent with applicable industry principles and therefore reliable.

**c. Fit**

---

[15]The Court is aware of Defendant's argument that the cause of the accident was a load shift caused in part by the failure to properly load, secure, and obey weight restrictions. Although this may have contributed to or even caused the accident, the determination of proximate cause is not addressed here.  Plaintiff is free to offer her theory of the case and the proofs in support- such as Dr. Vigilante's testimony.  Proximate cause will be addressed *infra*, with the summary judgment considerations.

Dr. Vigilante's credentials fit with the type of testimony he offers.  The final requirement of Rule 702 is "fit," that is, whether the expert's testimony would be of assistance to the trier of fact. See Elcock, 233 F.3d at 741. Courts must determine the fit "'between the scientific research or test result to be presented and particular disputed factual issues in the case.'" Paoli II, 35 F.3d at 743 (quoting United States v. Downing, 753 F.2d 1224, 1237 (3d Cir. 1985)).

Defendant argues, *inter alia*, that Dr. Vigilante's warning does not fit this case because heeding the warning would not have changed the outcome.  Whether or not the warning would have made a difference in this case will be dealt with on summary judgment.  The fact that Vigilante crafted the warning using acceptable methods and that the warning addresses the issues in this case put his opinions beyond the *ipse dixit* of the expert and are sufficiently connected to the sources from which he relies to survive a Daubert challenge.

Unlike the normative opinion excluded in Wald, Dr. Vigilante's opinion fits this case and may assist the trier of fact.  The Court finds that it fits under Daubert.

### IV. Conclusion

The Court finds that Plaintiff's L. Civ. R. 56.1 response will be considered to the extent it makes an admission or denial.  The Court will disregard the inappropriate legal arguments contained therein.  In addition, the opinions offered by Brooks Rugemer and Dr. William Vigilante are sufficiently reliable and admissible under Daubert, Fed. R. Evid. 702, and Fed. R. Evid. 403 and 404.  The Court denies Defendant's motions to preclude these experts' testimony.

Given the fact that the hearings in this case lasted in excess of fifteen hours and

that the Court has not yet obtained the transcript of the hearing on March 12, 2013, it will publish its decision on Defendant's Motion for Summary Judgment on or about April 29, 2013.

An appropriate Order shall issue.


Dated: March 28, 2013



 s/ Joseph H. Rodriguez
Hon. Joseph H. Rodriguez,
United States District Judge