UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JESSICA DURKIN, both individually , and as Administratrix of the Estate and Administratrix Ad Prosequendum of the Estate of WILLIAM R. GANGELL, JR., Deceased, | : : : : : : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 10-2013 |
| v. | : : | |
| WABASH NATIONAL, | : : | **OPINION** |
| Defendant. | : | |

Presently before the Court is Defendant Wabash National Corporation's (hereinafter "Wabash") motion for Summary Judgment [Dkt. No. 149] pursuant to Fed. R. Civ. P. 56.  Recently, the Court granted in part Wabash's Motion to Strike Plaintiff's Responses to the Statement of Undisputed Facts [174] pursuant to L. Civ. R. 56.1(a).  In addition, the Court denied Wabash's Motions to Preclude the Testimony of Plaintiff's Experts Brooks Rugemer [Dkt. No. 152] and William Vigilante [Dkt. No. 154] pursuant to Fed. R. Evid. 702.

Plaintiff Jessica Durkin[1] (hereinafter "Durkin") opposes the motion and the Court has considered the written submissions of the parties and heard oral argument on the summary judgment motion on March 12, 2013.  For the reasons set forth below, Wabash's Motion for Summary Judgment is granted.

---

[1] Durkin was engaged to William Gangell.  She is suing both individually and as Administratrix of the Estate and Administratrix Ad Prosequendum of the Estate of William R. Gangell, Jr., Deceased.

# I. BACKGROUND

Although the parties are familiar with the facts of this case, for the convenience of the reader, the Court will incorporate the background it set forth in the March 28, 2013 Opinion denying Defendant's Motion to preclude plaintiff's experts.  In addition, because the expert testimony and the arguments in favor of excluding it are also germane to the issues on summary judgment, the Court will incorporate relevant portions of the March 28, 2013 Opinion here.

## A. Procedural History and Posture

The following background is partially excerpted from the Court's Opinion in this matter on October 19, 2010. Durkin v. Pacaar, Inc., No. 10-2013, 2010 WL 4117110 (D.N.J. Oct. 19, 2010).  The tragic facts underlying this action are fairly straightforward.  On November 12, 2008, William Gangell, a New Jersey citizen, was operating a tractor-trailer loaded with a steel load in Franklin Township, New Jersey.  (Compl. ¶ 6.)  The steel load shifted forward during a braking maneuver, which collapsed the bulkhead of the truck, pinning Gangell inside.  (Compl. ¶¶ 7-8.) Gangell died later that day as a result of the injuries he suffered in the accident.  (Id.)

The facts surrounding the subsequent litigation stemming from this incident are less than straightforward and the Court does not recount in full the extensive, convoluted, and much disputed procedural history.[2]  At this juncture, Wabash is the only remaining defendant in this matter and Plaintiff's sole claim against Wabash is

---

[2]A detailed procedural history is found in the Eastern District of Pennsylvania's Memorandum Order, transferring the case from the Eastern District of Pennsylvania to this Court, Durkin v. Paccar, Inc., et al., No. 09-4892, 2010 WL 176851 (E.D. Pa. Jan. 19, 2010) and in this Court's October 19, 2010 Memorandum Opinion and Order granting Partial Dismissal, Durkin, 2010 WL 4117110.

predicated upon a failure to warn theory.  In general terms, Plaintiff's Complaint alleges that Wabash is liable for Gangell's death because Wabash failed to warn drivers of the danger that its bulkhead did not provide any protection from shifting loads.  Specifically, Plaintiff claims that the bulkhead of the cab lacked a warning, that the absence of a warning existed when Wabash manufactured the tractor-trailer, that the lack of warning was the proximate cause of Gangell's death, and that Gangell was a foreseeable user of the cab.  Wabash moves for summary judgment on the grounds that it had no duty to warn and, in the alternative, that Plaintiff cannot prove causation.  Intertwined with the summary judgment motion are Wabash's arguments in support of its motions to preclude Plaintiff's experts Rugemer and Vigilante, and its motion to strike.  Those arguments are again considered with respect to summary judgment.

**B. Factual Background**[3]

Plaintiff's decedent, Gangell, was employed by R.E. Pierson Construction Co. and was acting in the course of his employment as a driver on November 12, 2008.  Def. Facts. ¶4.  The tractor-trailer that Gangell operated that day was one of twenty-four trailers manufactured by Wabash in 1999 and purchased by Pierson in March 2000.  Id.

---

[3] The Court commonly turns to the recitation of the undisputed facts to paint the picture of the circumstances and factors considered on summary judgment.  "The purpose behind such a statement is to clarify the issues for the Court, not to increase the burden before it." Globespanvirata v. Texas Instrument, No. 03-2854, 2005 WL 3077915, at *2 (D.N.J. Nov. 15, 2005)."  L.Civ.R. 56.1, Comment 2d.  Review of the "undisputed facts" of this case, as well as a review of the procedural history and letter writing campaign since the inception of this case, reveals only one certainty: everything is disputed. The Court disregards inappropriate conjecture and legal agreement and accepts only whether a particular fact is denied or admitted. The facts as set forth are as the Court understands the facts of the case, with consideration as to the parties' arguments.

at ¶¶ 25, 27.  The tractor trailer weighed 16,730 pounds and the trailer weighed 11,700

pounds, for a total weight of 28,500 pounds.  Id. ¶ 29.  The trailer was loaded with eleven

50 foot long, coated PZ-35 double sheet pilings, with each piling weighing 6,600

pounds.  Id. ¶ 5.  The payload of steel sheets had a combined weight of 72,600 pounds.

Id.  The trailer was equipped with a bulkhead, also manufactured and installed by

Wabash.  Gangell was delivering the steel to a job site and was traveling through

Franklin Township, New Jersey.  Compl. ¶ 6.  As the vehicle approached the intersection

of Coles Mill Road and Wall Street, Gangell applied his brakes in response to a vehicle

ahead of him making a left turn.  As a result, the steel payload shifted, knocked down the

bulkhead, and penetrated the cab of the tractor, pinning Gangell inside.  Gangell did not

die immediately and was able to communicate with first responders.  Unfortunately,

Gangell went into cardiac arrest and later died from his injuries sustained in the

accident. See, generally, Compl.

The parties have different views on the cause of the accident.  Plaintiff faults

Defendant for failing to warn Gangell that the steel bulkhead did not offer any

protection.  Defendant faults Gangell for failing to properly secure the load and for

attempting to transport a payload with a weight that violated federal and state

regulations.  To understand the parties' positions, a discussion on the trailer, the

bulkhead, and the various federal and state regulations that governed the transportation

of Gangell's trip is necessary.

### A. The Trailer

Wabash manufactured the trailer that Gangell was hauling.  It had twelve side rail

sliding winches, which were part of the load securement system. Ex. DD. Sales

Documents.  In addition, the trailer was equipped with 48 stake pockets and 48 pipe spacers, which can both be used to attach chains or other securement devices. Kemp Report, Ex. T, at 3.  The trailer was labeled in accordance with 49 C.F.R. §567.4 with a 100,000 pound Gross Vehicle Weight Restriction (GVWR) and a 20,000 pound Gross Axle Weight Restriction (GAWR) for each of two axles.  Id. at 150-21: 5.  In layman's terms, this means that the trailer was capable of hauling a load that weighed up to 100,000 pounds, as long as it was loaded in a manner in which the weight upon each axle did not exceed 20,000 pounds.

## B. The Bulkhead[4]

The trailer was equipped with a bulkhead, which was also manufactured and installed by Wabash.  There is evidence in the record that bulkheads, or front end structures, can be used for reasons other than load securement, such as tarping, storage and windbreak. Kemp Dep., Ex. Z, at 37; Vadnais Report, Ex. BB, at 5.  Bulkheads are also used for protection from shifting loads. Commercial Driver's License ("CDL") Manual, Ex. F at p. 3-58.  When used for protection, the amount of force a bulkhead can withstand depends on the manner in which cargo is loaded, either up against the bulkhead or not in contact with it, and the rating of the bulkhead.  Commonly, bulkheads will have a rating affixed to them that indicates that the Department of Transportation has certified the bulkhead to meet certain strength standards for a static load; which is a load where the cargo is loaded so that it braces the structure.  These bulkheads are called "DOT rated" bulkheads.

---

[4]The term bulkhead refers to a structure that may be found at the front of a flat bed trailer. It is also commonly referred to as a headerboard or headboard.

The Wabash bulkhead in this case did not have a DOT rating, and therefore, there was no indication on the bulkhead that it was suited to meet a certain strength rating. This does not mean that the Wabash bulkhead did not meet any strength standards or that it could not withstand a certain amount of force.  Rather, the absence of the rating means only that it was not certified to meet an identifiable strength standard.  These bulkheads are referred to as "NON-DOT rated."  The difference[5] between DOT rated bulkheads and Non Dot rated bulkheads is described by a manufacturer as follows:

> DOT rated bulkheads have been tested and certified to certain sections of the Federal Department of Transportation Regulations for front-end safety structures and are independently tested to ensure that they meet such standards when properly installed.  A DOT rated bulkhead will be clearly marked with a label on the bulkhead itself.  Non-DOT rated bulkheads are not guaranteed to meet these standards.

Aero Industries Frequently Asked Questions, Ex. U.

Plaintiff contends that Gangell believed the Wabash bulkhead was DOT rated and offered protection proportionate to the load capacity of the trailer (which was 100,000 pounds) to which it was affixed.  Plaintiff acknowledges that bulkheads serve functions, besides protection from a shifting load.  However, Plaintiff argues that because this bulkhead was placed on a heavy duty trailer capable of hauling 100,000 pounds of cargo, Gangell reasonably believed that the bulkhead structure offered protection

---

[5]Defendant argues that the fact that a bulkhead may be DOT-FMCSA rated does not factor in to the equation and is a red herring.  There is much discussion in the record about the existence of Non-DOT rated bulkheads.  Some experts on both sides were unaware that they existed.  Defendant offers proof of their existence by appending materials from other manufacturers that offer them. See Ex. X, Sturdy-Lite frequently asked questions; Ex. Y, Utility bulkhead options.   In addition, Defendant's expert David Kemp, who was at one time employed by Great Dane Trailers and Dorsey Trailers stated that both companies carried Non-DOT rated bulkheads. See Kemp Report, Ex. T. at 5; Kemp Dep., Ex. Z at 29-31, 33-38.

proportionate to the trailer's hauling capacity.  According to Plaintiff, the lack of a warning on the subject bulkhead alerting Gangell that the bulkhead offered little protection — or at least less protection than what Gangell otherwise would expect — was the proximate cause of Gangell's death.

Plaintiff's expert, Dr. William Vigilante, submits a proposed warning:

**WARNING**
- This model Bulkhead is NOT FMCSA-DOT compliant.
- This Bulkhead does NOT provide cab protection or cargo securement.
- This Bulkhead is designed for use with tractors that have integrated cab protection only.
- Always ensure your cab protection is FMCSR-DOT rated.

Plaintiff contends that had Gangell been aware that the bulkhead attached to his trailer, a trailer that had the capacity to hold 100,000 pounds of cargo, would not provide him with any protection in the event of a load shift, Gangell would have endeavored to haul the load differently, perhaps by taking two trips, using a different trailer, or employing additional securement devices.

### C. Applicable Regulations

Defendant contends that Gangell's overloading of the trailer and/or failure to properly secure the load were the proximate cause of his death.  There is no dispute that the combined weight of the vehicle and the cargo was roughly 103,000 pounds; 23,000 pounds over a state regulation that precludes travel of a vehicle weighing over 80,000 pounds. N.J.S.A. 39:3-84(b)(2); see also Def. Facts at ¶7.  Trooper Pecenak of the New Jersey State Police Investigation Unit estimated that the cargo load weight was roughly 74,5000 pounds. Police Report, Doc. 150-1.  Even though the trailer may have had the capacity to haul the load, see Pl.'s Fact Resp., ¶ 5, Pierson was cited for the overloaded

tractor-trailer because the combined gross vehicle weight of the tractor, trailer and load

exceeded 80,000 pounds.  Def. Facts. at 7.

Defendant also cites to the Federal Register Code of Federal Regulations that

were in place at the time of the accident and govern load securement requirements.  In

the year 2000, The Federal Motor Carrier Safety Act ("FMCSA") proposed new rules,

which state in part:

> The current rule emphasizes occupant protection rather than cargo
> securement.  It is expected that cargo that is not braced against a front-end
> structure could shift forward, and the structure would prevent the load
> from penetrating the driver's compartment.  While this concept may have
> been required for certain types of cargo, the FMSCA believes the best way
> to ensure driver's safety is to have tougher standards to prevent the cargo
> from shifting forward.  For example, if the vehicle is transporting metal
> coils, once the load begins to move forward, it is unlikely that a front-end
> structure would save the driver.

See Ex. C, 65 Fed. Reg. 79050-55 (Dec. 18, 2000).

This Rule was promulgated in 2002.  In general terms, the new rules require

better load securement, most often achieved by increasing the number of tie down

devices used and the manner in which the cargo is loaded.  "[B]y establishing new rules

to better ensure that [cargo does] not move forward, we are more likely to accomplish

the safety objective of saving lives and preventing injuries." 67 Fed. Reg. 61212, 61221

(Sept. 27, 2002), Ex. D.  The new securement rules were available to Pierson, Gangell's

employer.

Wabash also cites to rules in effect that speak to the requirements of the front end

structure in conjunction with securement when loading and transporting cargo.

Specifically, when a front end structure is used as part of the load securement, i.e. the

cargo is in contact with the front end structure of the vehicle, the bulkhead must meet

certain performance standards identified in the FMCSA Regulations.  See § 393.114(a)(1) (stating that "a front end structure less than 6 feet in height, a horizontal forward static load equal to one-half (0.5) of the weight of the articles of cargo being transported on the vehicle.")  There are no regulations that require a bulkhead to be rated if the bulkhead is not being used for purposes of cargo securement.

The requisite number of tie down devices and the method of securement also depends upon whether the bulkhead is used as part of the cargo securement.  For example, FMCSR § 393.110 governs tie downs where "an article is not blocked or positioned to prevent movement in the forward direction by a headerboard, bulkhead, other cargo that is positioned to prevent movement[.]"  This is the scenario here, the cargo was not in contact with the bulkhead at the time of loading, so the bulkhead was not being used as part of the securement system.[6]  In such situations, FMCSR § 393.110 requires  "[t]wo tiedowns if the article is longer than 10 feet (3.04 meters), and one additional tiedown for every 10 feet (3.04 meters) of article length, or fraction thereof, beyond the first 10 feet (3.04 meters) of length" to secure the cargo. FMCSR §393.110(b)(3).

Under the FMCSR regulations applicable in this case, at least seven tie down devices were necessary for cargo securement, given the length of the steel sheets being transported. See FMCSR §393.106(d); New Jersey State Police Driver Examination Report, Doc. 168-8.  Only six were used and there is a factual dispute as to whether all

---

[6] There is evidence in the record that suggests that one would load the cargo in a manner in which the cargo is not up against the bulkhead in order to comply with GAWR, i.e., to ensure that the axles are not overloaded, or because some loads need to be placed on the trailer from the side. See Ashby Dep. 44; 1-12.

six were in working condition; at least one strap was broken and it cannot be determined if the breakage existed prior to the accident or as a result thereof.  See New Jersey State Police Driver Examination Report, Doc. 168-8. Wabash argues that 8 straps should have been used.

Defendant's cite The Driver's Handbook On Cargo Securement as another source of information on securement practices.  In a section on warnings that displays the text inside a red box next to art depicting "caution", the Handbook indicates that a front end structure can be used to "provide some restraint against forward movement if the cargo is in contact with it."  See WNC1035.  Under the heading of "Fundamentals of Cargo Securement," the Handbook warns that an improperly secured load can result in death, loss of the load, damage to the cargo, damage to the vehicle, a crash, issuance of citations and the vehicle being placed out of service. See WNC1028.

Plaintiff heavily relies on a depiction contained in the Commercial Driver's License Manual that is titled "Tie-Down Devices" and shows a flatbed trailer with a front-end structure.  The cargo is secured on the trailer in a manner that allows for a gap between the bulkhead and the cargo; stated differently, the cargo and bulkhead are not in contact.  On the same page as the depiction is the following statement:

> Front-end headerboards ("headache racks") protect you from your cargo in case of a crash or emergency stop.  Make sure the front-end structure is in good condition.  The front-end structure should block the forward movement of any cargo you carry.

Ex. B, p. 3-58.  Plaintiff argues that this diagram and language alone are sufficient to defeat Wabash's summary judgment motion.  Plaintiff argues that the depiction in the CDL Manual led Gangell to believe that he could rely on the bulkhead for protection,

even if he loaded the trailer without the cargo and bulkhead being in contact.  Notably, on the same page is language stating, "There are special requirements for securing various heavy pieces of metal.  Find out what they are if you are to carry such loads."  Id.

Defendant argues that the above regulations and guidelines govern the use of the bulkhead and the expectation of protection provided by the bulkhead when used in accordance with the securement provisions.  Wabash contends that the bulkhead only offers protection when the cargo is in contact with the front end structure of the vehicle and that Gangell could not have relied on it in the present circumstance.  See FMSCR §393.114(a) (stating that the strength requirements for front-end structures apply only to motor vehicle transporting articles that are in contact with the front-end structure) (emphasis added); Larry Minor's 2008 PowerPoint Presentation, Ex. H., Doc. 150-9. Therefore, Defendant argues that the fact that the bulkhead was not rated is immaterial because it was not being used for cargo securement purposes.  Accordingly, the combination of Gangell's failure to properly secure the load, the weight of the steel, and Gangell's disregard for the regulations governing the securement of his cargo were the proximate cause of the accident.

Defendant further argues that it had no duty to warn Gangell that the bulkhead attached to his trailer was Non-DOT rated because Gangell was not using the bulkhead for cargo securement and because there is no evidence that a DOT rated bulkhead would have stopped the accident in this case.  In fact, Defendant claims that Plaintiff abandoned her design defect claim because her expert was unable to design an alternative bulkhead that would have with stood the forces at play in the accident under identical circumstances.  For these reasons, Defendant argues that the negligent and

non- compliant manner of load securement coupled with the weight and overloaded cargo- and not the failure of the bulkhead- were the cause of the accident.   Plaintiff relies heavily on the diagram of a loaded tractor trailer depicted in the Commercial Driver's License Manual as creating an issue of fact during her oral opposition to the pending motions at the hearings on February 20, 2013 and March 12, 2013.  The issues at hand are whether Wabash had a duty to warn Gangell that the bulkhead placed on its trailer did not offer the expected protection, and if so, whether that failure to warn was the proximate cause of Gangell's death.

## II. Summary Judgment

Defendant claims that it owed no duty to warn Gangell that the bulkhead was not DOT rated because the industry standard provided that only rated bulkheads carried label warnings; the absence of a label warning, therefore is the warning that the structure is not suitable for load securement and does not offer any protection. In addition, Defendant claims that heeding the warning in this case would not have changed the outcome because Gangell's actions and inactions were the proximate cause of his death. For these reasons, Defendant contends summary judgment is warranted.

Plaintiff voluntarily abandoned her design defect claim and opposes the motion arguing that there are genuine issue of fact related to Gangell's knowledge of the bulkhead and its impact on his actions the day of the accident that preclude summary judgment.

### A.  Standard

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party

is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d
471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct.
2548, 91 L.Ed.2d 265  (1986)); accord Fed. R. Civ. P. 56 (c).  Thus, this Court will enter
summary judgment only when "the pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits, if any, show that there is no genuine
issue as to any material fact and that the moving party is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could
return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  A fact is "material" if, under the
governing substantive law, a dispute about the fact might affect the outcome of the suit.
Id.  In determining whether a genuine issue of material fact exists, the court must view
the facts and all reasonable inferences drawn from those facts in the light most favorable
to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.
574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986).

Initially, the moving party has the burden of demonstrating the absence of a
genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct.
2548, 91 L.Ed.2d 265 (1986).  Once the moving party has met this burden, the
nonmoving party must identify, by affidavits or otherwise, specific facts showing that
there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F.
Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for
summary judgment, the nonmoving party must identify specific facts and affirmative
evidence that contradict those offered by the moving party.  Andersen, 477 U.S. at 256-

57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . .' " Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the province of the finder of fact.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

When a plaintiff is required to submit expert testimony to establish an essential element of his or her case, the court may grant summary judgment if that testimony is excluded under Daubert.  Perry v. Novartis Pharm. Corp., 564 F. Supp. 2d 452, 473 (E.D.Pa. 2008).  Indeed, the Third Circuit affirmed a decision granting summary judgment after expert testimony was excluded as unreliable in a matter that required the assistance of an expert to establish the elements of the plaintiff's case.  Oddi, 234 F.3d 136.

### B. Summary Judgment & Plaintiff's Product Liability Claim

In New Jersey, "[t]he Product Liability Act governs 'any claim or action . . . for harm caused by a product, irrespective of the theory underlying the claim, except actions

for . . . breach of an express warranty.'" Levey v. Yamaha Motor Corp., 361 N.J. Super. 312, 318, 825 A.2d 554 (App. Div. 2003) (quoting N.J. Stat. Ann. §2A:58C-1(b)(3)). To succeed on a claim, a plaintiff must establish that he or she was a reasonably foreseeable or intended user of the product, that the was defective, that the defect existed when the product left the manufacturer's control, and that the product was the proximate cause of the plaintiff's injuries. See Lauder v. Teaneck Volunteer Ambulance Corps, 368 N.J. Super. 320, 331, 845 A.2d 1271 (App. Div. 2004); see also Ebenhoech v. Koppers Industries, Inc., 239 F. Supp. 2d 455, 469 (D.N.J. 2002). "[W]here the allegedly defective product involves a complex instrumentality, a plaintiff is required to provide expert testimony." Ortiz, supra, at *11 (citing Lauder, supra, at 331). Expert testimony distills the complex "mechanical intricacies of the instrumentality" so a jury can make a reasoned decision in a case. See Ebenhoech, 239 F. Supp. 2d at 468 (quoting Rocco v. N.J. Transit Rail Operations, 330 N.J. Super. 320, 341, 749 A.2d 868 (App. Div. 2000)). Relevant here, expert testimony is "generally needed as proof of an alternative warning. . ." Ebenhoech, supra, at 468.

    "A plaintiff asserting a cause of action based on failure to warn must establish all the same elements required for an action based on a defective product." Mathews v. Univ. Loft Co., 387 N.J. Super. 349, 362, 903 A.2d 1120 (App. Div. 2006) (quoting London v. Lederle Labs., 290 N.J. Super. 318, 326, 675 A.2d 1133 (App. Div. 1996) aff'd as modified by Batson v. Lederle Labs., 152 N.J. 14, 702 A.2d 471 (1997)). Even if a product is properly designed and manufactured, it may still be defective if it fails "to contain adequate warnings or instructions." N.J. Stat. Ann. 2A: 58C-2. In a failure to warn case, the alleged defect is not in the design or the manufacturing of the product.

Rather, "the defect is in the failure to warn unsuspecting users that the product can potentially cause injury." Zaza, 675 A.2d at 632.

The manufacturer has a duty to warn of "dangers" that it "should have known on the basis of reasonably obtainable or available knowledge." Feldman v. Lederle Labs., 479 A.2d 374, 376 (N.J. 1984). Thus, "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable ... warnings ... and the omissions of the ... warnings renders the product not reasonably safe." Indian Brand, 2010 WL 3122815, at * 13. In applying the factors to this case, in addition to whether a duty existed, the critical element is whether the failure to warn was a proximate cause of Gangell's injury. See London, supra at 326-27.

**C. Analysis**

Plaintiff argues that the danger in this case is the lack of warning—the prospect of a bulkhead attached to a heavy duty trailer absent any indication as to the functionality of the structure. Defendant argues that the danger is a load shift and that the proximate cause of the accident was Gangell's failure to properly secure the load and his decision to overload the trailer. While the Court recognizes that the trailer had the capacity to haul the weight of the load, the "overloading" relates to the combined weight of the tractor-trailer, including payload and vehicle, that is permitted for travel under state and federal law. The parties do not dispute the legal road weight limit of 80,000 pounds, but Plaintiff disputes its relevancy and argues that because the trailer had the capacity to haul 100,000 pounds, a warning that the bulkhead did not offer proportional protection was necessary. Wabash argues it had no duty to warn and, alternatively, that failure to warn was not the proximate cause of the accident.

**1. Duty**

There are genuine issues of material fact that preclude the Court's determination of whether a duty to warn exists in this case.  The New Jersey Product's Liability Act imposes on a manufacturer a duty "to take reasonable steps to ensure that appropriate warnings for safe use reach foreseeable users of the equipment."  See Grier v. Cochran Western Corp., 308 N.J. Super 308, 317 705 A.2d 1262 (App. Div. 1998).  The relevant portion of the New Jersey Product Liability Act provides:

> An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used.

N.J. Stat. Ann. §2A:58C-4. In Grier, the New Jersey Appellate Division opined:

> What a manufacturer may be reasonably required to do in order to transmit information to a consumer/user of a product may be quite different from what is required of a manufacturer of a product intended for use by many people over an extended period of time in an industrial environment.

Id. at 317.

However, no warning is necessary where the danger is obvious. See Restatement (Third) of Torts: Products Liability § 2, Reporters' Notes, comment a (Rationale). Mathews, 387 N.J. Super. 349, 903 A.2d at 1125 (no warning of risk of fall from a loft style bed required because falling out of bed is obvious risk).  Likewise, a manufacturer has no duty to warn a user to do what he is already required to do under the law.  See Ward v. Arm & Hammer, 341 F. Supp. 2d. 449, 501 (D.N.J. 2004) (holding that a manufacturer has no duty to warn of criminal consequences of the  unintended uses of a product). Accordingly, here Gangell and his employer were required to be

knowledgeable of the Federal Motor Carrier Safety Regulations (FMCSR), including how to properly secure cargo. See 29 C.F.R. § 1910.178 ("The employer shall ensure that each . . . operator is competent to operate a powered industrial truck safely, as demonstrated by the successful completion of the training and evaluation specified in this paragraph (1)").

Wabash argues that even though the tractor trailer had the capability to haul a load that would cause the combined weight of the cargo and vehicle to exceed the weight limitations imposed by the state and federal governments, it has no duty to warn Plaintiff that the protection offered by the bulkhead was insufficient to prevent penetration of the cab in the event of a load shift, especially here, where the cargo was loaded in a manner that caused a degree of separation between the front end and the payload; the two were not in contact.

When transporting cargo that was loaded in a manner where the cargo is not in contact with the front of the structure, the structure must be capable of withstanding "a horizontal forward static load equal to one-half (.5) of the weight of the articles of cargo being transported on the vehicle." 49 C.F.R. § 393.114(c)(1). The C.F.R. provides:

> (c) **Strength.** The front end structure must be capable of withstanding the following horizontal forward static load:
> (1) For a front end structure less than 6 feet in height, a horizontal forward static load equal to one-half (0.5) of the weight of the articles of cargo being transported on the vehicle uniformly distributed over the entire portion of the front end structure that is within 4 feet above the vehicle's floor or that is at or below a height above the vehicle's floor at which it blocks forward movement of any article of the vehicle's cargo, whichever is less; or
> (2) For a front end structure 6 feet in height or higher, a horizontal forward static load equal to four-tenths (0.4) of the weight of the articles of cargo being transported on the vehicle uniformly distributed over the entire front end structure.

49 C.F.R. § 393.114(c)(1).

Wabash argues that it did not violate any regulations by failing to provide a bulkhead that did not have a FMCSR-DOT rating, because no rating is required when the bulkhead is not being used for load securement, i.e., where the cargo and bulkhead are in contact.  In addition, Wabash should be able to count on compliance with the regulations and laws in formulating its decision as to whether a warning is necessary. Wabash submits expert testimony that suggests that the lack of a warning, or other indication of a rating/strength capability, can be a method of communicating information.  Defendant's expert Nathan Dorris explained that the lack of warning on the subject bulkhead communicated to Gangell that he could not assume a rating/strength capacity.  Dorris Dep., Doc. 172-22, Ex V. at 104-06.  Plaintiff's experts also agreed that, in certain circumstances, the lack of a rating or warning is information. For example, Brooks Rugemer agreed that you cannot rely on a product to have a "UL" rating if it is not marked as such. Rugemer Dep. 152-6 at 91-92.  Dr. Vigilante, referring to a different case in which he offered expert testimony, agreed that the lack of a "Snell" certification on a motorcycle helmet is the indication/warning that the helmet is not "Snell" certified.  Vigilante Dep., Doc. 154-7 at 78. (Emphasis added).

Pierson's corporate designee David Kunkel's testimony that the lack of a DOT rating is the indication that the structure is not certified is consistent with the expert's testimony above.  In response to a question asking the difference between rated and non rated bulkheads, Kunkel stated that a "DOT compliant bulkhead would have a label saying that it is DOT compliant, and it would also have a rating on it telling it what load

the bulkhead is good for."[7] Kunkel Dep., Doc. 172-3, Ex. B at 108.  Whether that is

indeed the accepted practice in this case is a question of disputed fact, particularly in

light of the fact that experts on both sides were unaware of the existence of non DOT

rated bulkheads.

Moreover, the bulkhead in this case had no warning, or any other information

identifying its appropriate use.  Viewing the facts in a light most favorable to Plaintiff, as

the Court must on summary judgment, there is a genuine issue of material fact related

to whether Gangell was using the bulkhead in a foreseeable manner and whether the a

reasonable truck driver would be able to distinguish the subject bulkhead as not

providing any protection, so as to trigger a duty to warn.  "What is reasonable depends

on the circumstances of a given case.  Questions of reasonableness in determining the

adequacy of warnings are ordinarily for the jury to resolve." Grier, 705 A.2d at 1266

(citing Dixon v. Jacobsen Mfg. Co., 270 N.J.Super. 569, 590-591, 637 A.2d 915 (App.

Div.), certif. denied, 136 N.J. 295, 642 A.2d 1004 (1994); Seeley v. Cincinnati Shaper

Co., Ltd., 256 N.J.Super. 1, 19, 606 A.2d 378 (App. Div.), certif. denied, 130 N.J. 598,

617 A.2d 1220 (1992); Butler v. PPG Indust., Inc., 201 N.J.Super. 558, 562, 493 A.2d 619

---

[7] There is some debate on whether the term "compliant" is appropriate when
referring to the FMSCR.  The FMSCR does not regulate the compliancy of bulkheads as
rated or non rated.  The FMSCR defines the appropriate strength provisions for a
bulkhead used as part of the load securement.  See § 393.114(a)(1) (stating that "a front
end structure less than 6 feet in height, a horizontal forward static load equal to one-half
(0.5) of the weight of the articles of cargo being transported on the vehicle.") Whether or
not the bulkhead is used in this manner impacts the number tie down devices and the
method of securement. See, e.g., FMCSA § 393.110 (governing tie downs where "an
article is not blocked or positioned to prevent movement in the forward direction by a
headerboard, bulkhead, other cargo that is positioned to prevent movement[.]"

(App. Div.), certif. denied, 102 N.J. 298, 508 A.2d 186 (1985)).

Here, the depiction of the bulkhead suggests that it is not readily distinguishable from a structure capable of bearing a load.  The fact that is was not certified to meet a certain strength requirement is also not visually discernable and experts on both sides of this case were not initially aware that such a structure existed, including Defendant's experts, Former Federal Tractor Trailer Safety Inspector Ronald Ashby and Heavy Truck Reconstructionist Thomas Vadnais.  As Plaintiff's experts posit, given the fact that the structure was placed on a trailer capable of hauling 100,000 pounds and that the CDL Manual depicts and describes a loading scenario similar to the case at bar, with commentary that suggests that a front end structure could provide protection, a jury could differ as to the expectation of a reasonable truck driver.  The federal regulations and expert testimony certainly indicate that proper load securement is essential to the functionality of front-end structures.  In addition, when front-end structures are used as part of the load securement, it appears that the load must be placed in contact with that structure to provide protection.  While the protection may be limited to static, rather than dynamic loads, the strength capability of the bulkhead may be part of the equation when a load cannot be achieved in the manner described, because of other factors, including gross axle ratings.  All of these factors are at play in the determination of whether the structure was being used in a foreseeable and reasonable manner.

New Jersey courts agree that the adequacy of a product warning is a jury question. See Levy v. Yamaha Motor Corp., 361 N.J.Super. 312, 825 A.2d 554, 558 (N.J.Super.App.Div. 2003); Grier, 705 A.2d at 126; see also Perlman v. Virtua Health, Inc., 01-CV-0651, 2005 WL 1038953, *4 (D.N.J. May 3, 2005) (relying on New Jersey

case law to support its conclusion that the an adequacy of a warning question go to the jury).  There was no warning in this case.  When viewed in a light most favorable to Plaintiff, the Court concludes that reasonable jurors could disagree over whether a warning was necessary, precluding summary judgment on this issue.

### 2. Proximate Cause

Assuming that a duty to warn exists, the Court next turns to whether the lack of warning was the proximate cause of the accident in this case. "[I]n a failure to warn case, establishing that the absence of a warning was a substantial factor in the harm alleged to have resulted from exposure to the product itself is particularly difficult." 257 N.J. Super. at 295, 608 A.2d 416. In New Jersey, the heeding presumption serves to lighten a plaintiff's burden of proof concerning proximate causation. See, e.g., Payne v. Soft Sheen Products, 486 A.2d 712, 725 (D.C.1985). Coffman v. Keene Corp., 133 N.J. 581, 599-603, 628 A.2d 710, 719 (1993).

The parties dispute the impact of the heeding presumption in this case, with Plaintiff arguing that it carries the day to survive summary judgment.  Plaintiff is half correct.  When Coffman is read as a whole, the only burden shifting stemming from the heeding presumption is with respect to the burden of production.  Once the heeding presumption comes into play, the burden of coming forward with or producing evidence shifts to the defendant to overcome or rebut the presumption.

As noted in Graves, the defendant's failure to produce evidence at this stage "risk[s] a directed finding against it" on the issue of proximate causation.  Graves, 267 N.J.Super. at 460, 631 A.2d 1248. If, however, the defendant satisfies its burden of production, that is, if defendant presents sufficient evidence to rebut the presumption,

an issue we deal with below, the presumption disappears and the plaintiff, consistent with his original burden of persuasion, must prove by a preponderance of the evidence that the failure to warn was a proximate cause of his injury. When the Supreme Court stated in Coffman that the "heeding presumption will serve to shift plaintiff's burden of proof on the issue of causation," the Court was simply indicating that if defendant fails to produce sufficient evidence to rebut the presumption, plaintiff is relieved of proving proximate causation. See Coffman, supra, 133 N.J. at 604, 628 A.2d 710 (recognizing case law which observes that once the presumption is rebutted by evidence, the "presumption disappears and goes for naught"). Sharpe v. Bestop, Inc., 314 N.J. Super. 54, 67, 713 A.2d 1079 (App. Div. 1988).

  After a review of the extensive briefing, the voluminous exhibits, and the oral arguments,  the Court finds that there are no genuine issues of material fact precluding summary judgment on this issue.  Here, Plaintiff agreed at oral argument that Defendant can overcome the heeding presumption in this case and there is ample evidence in the record tending to show that Gangell disregarded warnings.[8]  In addition, there is ample evidence in the record that demonstrates that on the day of the accident, Gangell failed to comply with and was cited for numerous violations, which further

---

[8] For example, Gangell was a smoker and had at least two citations in his glove compartment for failing to wear his seatbelt.  In addition, he did not heed the warning on the straps used to secure the metal sheets on the day of the accident which define the working load limits.  Gangell also did not heed the FMSCR with respect to weight restrictions (the GVWR was also marked on the door of the cab) and securement provisions.  His tractor was out of date for inspection and he was cited for numerous vehicle violations the day of the accident.

supports his disregard for regulations.[9]

He also disregarded axle ratings and inspection obligations.  Moreover, Gangell's actions that day were called into question by his own co-workers, who expressed concern over the amount of payload that Gangell was attempting to transport.  Gangell's coworker, James McKelvey, assisted in the loading of the trailer on the day of the accident and initially loaded only seven sheets of metal. McKelvey dep., Ex NNN, at 92-93.  He testified that he told Gangell seven sheets was all they normally hauled.  Id.  He further stated that it was Gangell who insisted on eleven because the transport was not a far distance and would take less time if accomplished in one trip. Id.  Likewise, Gangell's supervisor Kary Nelson testified that Gangell was aware of the weight of the haul because Nelson told Gangell. Nelson Dep., Ex. MMM, at 15-18. Gangell may have likewise been aware of another accident involving a Pierson driver in which the cab was pierced by the cargo.  Thus, the heeding presumption has been pierced.

In addition, the Court agrees with Defendant that even if Plaintiff heeded the proposed warning in this case, the unfortunate outcome remains unchanged.  There is no evidence in the record that if a DOT rated bulkhead was on the trailer that day, everything else remaining the same, the bulkhead would stop the steel from penetrating

---

[9] Plaintiff argues that none of the violations are relevant because they were minor infractions.  Plaintiff is incorrect that none of the infractions would have caused an "Out Of Service" violation, which results in an immediate cessation of the truck from continuing on its route. A number of the violations Pierson was cited for in this case would "ground" the truck: 393.48(a) inoperative brakes; 393.104(b) damaged securement tie downs; 393.104(f)(4), lack of edge protection for tie down number 4; 393.106(d) insufficient aggregate working load; 393.110(c) insufficient tie downs for an article; 393.102(a)(1) insufficient means to prevent longitudinal movement.

the cab.[10]  DOT Rated bulkheads are certified for a particular strength by a manufacturer to meet the static load ratings set forth in FMCSR 393.114.  The rating does not apply to dynamic loads, which was present in Gangell's accident.  As noted by Defendant, prior to the amendments in 2002, the FMCSR Blocking and Bracing Provision §393.104(a) noted the dangers of longitudinal movement. "When a motor vehicle carries cargo that is not firmly braced against a front-end structure that conforms to the requirements of §393.106, the cargo must be secured so that, when the vehicle decelerates at a rate of 20 feet per second, the cargo will remain on the vehicle and will not penetrate the vehicle's front-end structure." C.F.R. §393.104(a).

In addition, Defendant's experts claim that because the bulkhead was not rated, it was never designed for use as a front-end structure and could not be used as part of a cargo securement system.  Vadnais Report, Doc. 150-31, at 9.  Vadnais further claims that a front end structure cannot be used as part of the cargo securement system unless the user knows its rating—either because the user personally ordered the bulkhead or because the bulkhead rating is marked.  Vadnais Rep., Doc 172-8, Ex. F, at 84-85, 88-94.  Even though a non rated structure offers some protection from a static load, it cannot be used as part of the securement system because its rating is unknown.  Ashby Dep., Doc. 172-7, at 40-41, 48-49.  Plaintiff does not disagree.

The parties agree that a manufacturer is not required to provide any bulkhead or

_____

[10] This is partially the reason Plaintiff abandoned her design defect claim, because the alternate bulkhead designed by Plaintiff's expert Roger Dean Harris, would not have made a difference in this case.  Harris Dep. at 256.  A 25,000 pound DOT rated bulkhead would not have made a difference either.  Id. at 254-55; see also Entwistle Rep., Ex. JJ, at 6 (noting that there is no evidence that a DOT rated bulkhead would have prevented the accident.

other front-end structure on a trailer.  Defendant's expert Frank Entwisle opines that there is no evidence that a different cab structure would have changed the outcome of the accident and Durkin cannot refute this claim.  Entwisle Rep., Doc. 150-39; Entwisle Dep., Ex. U, Doc. 172-21.  According to Entwisle, the only way to prevent the accident would have been through compliance with the federal regulations governing weight restrictions and load securement.  Id.  Proper securement of the load was something that Gangell was already required to do pursuant to FMCSR §393.110(b)(3).  Plaintiff's expert Brooks Rugemer agreed that proper load securement was essential in preventing a load shift.  Rugemer Dep. at 125-26; 211.  It would seem that, given the size of the steel beams, it was obvious that the load posed a danger of shifting.  Defendant need not warn where the dangers or risks are obvious or where a user is already required act under the law.  See Mathews, 389 N.J. Super. 349, 903 A.2d at 1125; Ward, 341 F. Supp. 2d. at 501. And Plaintiff agrees that Gangell could not transport the load without any securement measures; proper securement is essential.

Plaintiff abandoned her design defect claim, because the conditions of the vehicle as they existed (method, number of straps, and weight of the load) would have compromised a DOT-rated bulkhead and pierced the cab.  Plaintiff's argument in opposition to summary judgment is that if Gangell knew that the bulkhead would not have offered him protection, then he would have had a variety of options, such as: not driving the load at all, using criss-crossing strapping methods, using a different tractor/trailer combination, or taking the load in two trips. Plaintiff's opposition Brief, FN 17.  However, these arguments lack evidentiary support in the record.  At best, Plaintiff can only point to a depiction in the CDL manual that may have enabled

Gangell's legally deficient actions on the day of the accident. Plaintiff argues that the depiction alone is sufficient to defeat the summary judgment motion.  For the following reasons, the Court disagrees.

The depiction in the CDL Manual is obfuscated by the admonition in text, located directly beneath the depiction, which warns of the particular caution to be exercised when transporting metal.  In addition, the Manual contains warnings that loose cargo could kill and also warns of the dangers of overloading the vehicle.  See CDL Manual, Section 3, Transporting Cargo Safely. Finally, there is no evidence in the record to even remotely suggest that Gangell saw, let alone relied, on the depiction in the N.J. CDL Manual, as authoritative.  Gangell obtained his CDL in Massachusetts in 1992.  There is no evidence that the Massachusetts CDL Manual contains a similar depiction; Defendant presented argument that it does not contain such a depiction.  For these reasons, the value of the CDL Manual is "merely 'colorable' [and] 'not significantly probative.[.]'"  Peterson v. Am. Tel. & Tel. Co., Civ. A. No. 99-4982, 2004 WL 190295, at *3 (D.N.J. Jan. 9, 2004) (quoting Anderson, 477 U.S. at 249).  Even giving Plaintiff the benefit of the doubt, the evidence in the record tending to support Plaintiff's claims does not "exceed the 'mere scintilla' standard." Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993); see also Anderson, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].").  Under such circumstances, "the court should enter summary judgment in favor of the moving party." Peterson, 2004 WL 190295, at *3.

Here, Plaintiff cannot reasonably demonstrate that the absence of a warning on

the bulkhead was a proximate cause of Gangell's death. See Campos v. Firestone Tire & Rubber Co., 98 N.J. 198, 485 A.2d 305 (1984).  Like the plaintiff in Scrofani v. Stihl, Gangell's disregard of the regulations related to GVWR, GRAR, the straps, and the securement provision demonstrate that Gangell would likely "have ignored the most perfect of warnings."  Scrofani v. Stihl, 44 Fed. Appx. 559, 563 (3d Cir. 2002).[11] "Evidence that a plaintiff would have disregarded an adequate warning … tend[s] to demonstrate that the plaintiff's conduct, rather than the absence of a warning, was the cause in fact of the resultant injury." Id. (quoting Coffman, 133 N.J. at 604, 628 A.2d 710.)  As in Stihl, Plaintiff's failure to submit evidence "indicating that a different warning would have prevented this accident" warrants summary judgment. Stihl, 44 Fed. Appx. at 563.

Even if Gangell mistakenly believed that he had a DOT rated Bulkhead, as Plaintiff's experts suggest, the evidence indicates that he should have known that it would not have offered him unlimited protection from a dynamic load with insufficient strapping measures.  Additionally, there is no evidence that additional criss-cross strapping would have prevented the shift of the load or impeded the shift in a way that decelerated its impact with the bulkhead to the extent that penetration would be frustrated.  The Court agrees with Defendant that the proposed warning, if heeded, would not have prevented the accident.  There is no evidence that a DOT rated bulkhead

---

[11] A grant of summary judgment was affirmed where an injured construction worker's claim that a gasoline-powered saw contained an inadequate warning was rebutted by evidence that the worker would have ignored even the most perfect of warnings. The worker testified that despite his awareness of the risks and warnings he acted in direct contravention of that knowledge.

would have performed differently under similar circumstances.  Gangell was free to take two trips and he alone frustrated efforts by his crew to load the metal in a manner that required two trips.   Finally, Plaintiff's analogy to and reliance upon Sharpe, 314 N.J.Super. 54, 713 A.2d 1079, is unpersuasive because it discounts the lack of evidence in this case.  In Sharpe, the Plaintiff sued the manufacturer of a soft convertible top and doors that replaced the standard fiberglass components of the Jeep under  design defect and failure to warn theories.  Plaintiff was operating the Jeep without wearing a seatbelt and fell asleep at the wheel.  Plaintiff and his passenger, who was also not wearing a seatbelt, were ejected from the vehicle when the Jeep veered off of the road and crashed into a guardrail. Plaintiff sued the manufacturer, among other things, alleging that the failure to provide adequate warnings for the soft top's safe use was a proximate cause of the accident.  A jury found in favor of Defendant.

The Court agrees that the facts in Sharpe are similar to this case; both cases involve plaintiffs who disregarded applicable safety laws on the day of their accidents. Both cases involve obvious dangers and the absence of a warning.  Because the claims in Sharpe were presented to a jury, despite Sharpe's own negligent conduct of failing to wear a safety belt and falling asleep at the wheel, Durkin argues that its claims should likewise be determined by a jury.  The Court disagrees. Plaintiff asks this Court to speculate that the claims in Sharpe survived a summary judgment motion. To the extent that the claims were the subject of motion practice, this Court is without the benefit of the Sharpe court's analysis.  Even if the heeding presumption in Sharpe permitted the case to go to a jury, it does not follow that every case invoking the presumption should automatically be determined by a jury and the Court is not persuaded that Sharpe,

decided over 15 years ago, mandates that this case survive summary judgment.

Here, Plaintiff conceded at oral argument that the heeding presumption would be rebutted in light of Mr. Gangell's documented history of disregarding warnings. In addition, the proposed warning would not have yielded a different result. <u>Michalko v. Cooke Color & Chem. Corp.</u>, 91 N.J. 386, 394, 451 A.2d 179 (1982); <u>Vallillo v. Muskin Corp.</u>, 212 N.J.Super. 155, 159, 514 A.2d 528 (App. Div. 1986).  Even giving Plaintiff every inference, a reasonable juror could not conclude that the failure to warn Gangell of the nature of the protection, or lack of protection, of the bulkhead was a proximate cause of the accident.

### III. Conclusion

For the reasons stated herein, even assuming that the Defendant owed a duty of care to Gangell, there are no questions of fact precluding summary judgment on the issue of proximate cause.  As a result, summary judgment is granted in favor of Defendant Wabash.

An appropriate Order shall issue.


Dated: May 29, 2013



                                    s/ Joseph H. Rodriguez
                                   Hon. Joseph H. Rodriguez,
                                   United States District Judge